UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
ERIK JOHNSON,                                              :
                                                          :
                                  Petitioner,             :
                                                          :        REPORT &
          -against-                                       :        RECOMMENDATION
                                                          :        13-CV-4337 (MKB) (SMG)
PATRICK GRIFFIN,                                          :
                                                          :
                                  Respondent.             :
------------------------------------------------------------------ x
GOLD, STEVEN M., U.S. Magistrate Judge:

## INTRODUCTION

Erik Johnson, moving *pro se*, brings this petition for a writ of habeas corpus pursuant to

the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  In

March 2010, following a jury trial in Queens County, petitioner was convicted of second-degree

murder and fourth-degree criminal possession of a weapon and sentenced to twenty-five years to

life for the murder conviction to be served concurrently with one year for the weapon conviction.

Pet. for Writ of Habeas Corpus ("Habeas Pet.")[1] at 1, Dkt. 1; Aff. in Opp. to the Pet. for Writ of

Habeas Corpus by Ellen C. Abbot ("Abbot Aff.") ¶ 26, Dkt. 8 at ECF pages 3–16.  Petitioner's

conviction was affirmed by the Appellate Division, *People v. Johnson*, 95 A.D.3d 1237 (2d

Dep't 2012), and his application for leave to appeal to the Court of Appeals was denied, *People*

*v. Johnson*, 19 N.Y.3d 997 (2012).

In his habeas petition, petitioner challenges his conviction on the grounds that: 1) he was

denied a fair trial and the right to confront witnesses under the People's control because the

prosecution did not call Thomas Livingston as a witness and the trial court did not give a missing

---

[1] The page numbers used when citing to the Habeas Petition refer to the page numbers of the PDF document filed at Dkt. 1.  Within the 186-page filing, petitioner's memorandum of law is at pages 17–35 and his exhibits are at pages 36–71.  The appellate briefs and state appellate decisions are at pages 72–186.

witness charge regarding Livingston; 2) he was denied a fair trial because the trial court admitted hearsay testimony recounting statements made by the victim describing petitioner's prior uncharged misconduct and bad acts; and 3) he was denied the right to the effective assistance of trial counsel.  Habeas Pet. at 20–21, 26, 31.[2]  Petitioner raises a fourth claim in his reply: 4) the evidence presented at trial, particularly the scientific evidence, circumstantial evidence, and testimony, was insufficient to support his conviction.  Pet.'s Traverse & Mem. of Law ("Pet.'s Reply") at 12, 14–15, Dkt. 12.

By Order dated April 30, 2020, United States District Judge Margot K. Brodie referred the petition to me for report and recommendation.  For the reasons stated below, I respectfully recommend that Johnson's petition be denied in its entirety.

## BACKGROUND

Petitioner's ex-girlfriend, Asma Johnson,[3] was found stabbed to death in her apartment in Queens, New York, on the night of November 8, 2006.  Abbot Aff. ¶ 4.  Police arrested petitioner at his mother's home in Pennsylvania two weeks later.  *Id.*  Petitioner was charged with murder in the second degree, N.Y. Penal Law § 125.25(1), and criminal possession of a weapon in the fourth degree, N.Y. Penal Law § 265.01(2).  *Id.* ¶ 5.

## I.     The Trial

The petitioner's jury trial commenced on January 27, 2010, in Queens County Supreme Court before Judge Gregory Lasak.  State Trial Tr.[4] ("Tr.") at 1, Dkt. 10-2 at ECF page 63, 10-3,

---

[2] The number assigned to each of petitioner's arguments corresponds with "Point One," "Point Two," and "Point Three" in the Habeas Petition.

[3] Though the victim, Asma Johnson, shares the same last name as petitioner, Erik Johnson, they are not related.  *See* Tr. at 348:19-21.  To avoid confusion, I refer to the Ms. Johnson as the "victim" and Mr. Johnson as "petitioner."

[4] "Tr." refers to the state court trial record, which is spread over seven attachments at Dkts. 10-2, 10-3, 10-4, 10-5, 10-6, 10-7, and 10-8 on ECF.  Dkt. 10-2 contains pages 1–134 of the transcript, beginning at page 63 of the ECF document; Dkt. 10-3 contains pages 135–325; Dkt. 10-4 contains pages 326–526; Dkt. 10-5 contains pages 527–

10-4, 10-5, 10-6, 10-7, 10-8.  As summarized below, the People presented substantial evidence connecting petitioner to the victim's murder.

   A. *The Evidence at Trial*

The People presented nineteen witnesses, including the police officers who arrived at the scene of the crime and arrested the petitioner, the victim's daughter and two friends, several of the victim's neighbors, the petitioner's aunt and cousin, the petitioner's parole officer, the medical examiner who conducted the autopsy, and the medical examiners who analyzed DNA recovered from the murder weapon and the victim.

The testimony of the victim's daughter and friends established that the petitioner and victim began dating in early fall of 2006.  Tr. at 502:4-7, 645:17-21, 676:23–677:6.  By late October, however, the relationship deteriorated and the petitioner became increasingly aggressive.  *See* Tr. 502:8–505:15.  The victim's daughter, Najiyah Livingston, who was seven-years-old at the time of the incident, testified that the petitioner waited outside of the apartment and pushed his way in once she opened the door on two occasions in late October.  Tr. at 497:6-7, 502:11-17.  On one of those occasions, the petitioner pushed the victim, causing her to badly bruise her thigh, and on another Najiyah heard the petitioner and victim arguing.  Tr. at 502:18–504:15, 505:22–507:4.  The victim's friend and neighbor who lived across the hall, Yahaira Cabrera, saw the victim throwing out the trash a week before her murder, around November 1, 2006, and noticed bruises on her face.  Tr. at 657:14–658:4.  That same week, Cabrera saw the petitioner banging on the victim's door "several times."  Tr. at 658:16–659:7.  Another neighbor in the victim's apartment building, Brenda Jordan, testified that she saw the petitioner "either sitting on the stairs or standing next to the [victim's] door, or knocking on the door, calling her

530; Dkt. 10-6 contains pages 531–742; Dkt. 10-7 contains pages 743–933; Dkt. 10-8 contains pages 934–1026, ending at page 93 of the ECF document.

name" about twenty times in the weeks leading up to the murder on November 8, 2006.  Tr. at 764:6-24.

On November 8, 2006, the day of the murder, the petitioner was again seen aggressively attempting to gain entry to the victim's apartment.  Cabrera saw the petitioner banging on the victim's door between 2:00 p.m. and 3:00 p.m. and heard him yell "open the f***ing door."  Tr. at 647:16–648:24.  Jordan saw the petitioner standing at the victim's door between 2:45 p.m. and 3:45 p.m.  Tr. at 762:20–763:7.  When Najiyah and her brother left their mother's apartment on that day at about 5:45 p.m. because her father, Thomas Livingston, was outside waiting to drive them to play games at Najiyah's school, petitioner was waiting in the hallway and pushed his way into the apartment.  Tr. at 498:6–501:2.  Najiyah asked her mother if she was going to be okay and her mother said yes and told the children to go downstairs.  Tr. at 501:13-19.  Both children then left, leaving the victim alone in the apartment with the petitioner.  Tr. at 501:21–502:3.

Najiyah testified that her father, Livingston, received a call from the victim later that night while driving the children back to the victim's apartment.  Tr. at 508:3-17.  The victim apparently told Livingston not to bring the children home, which led Livingston to ask Najiyah who was at the apartment with her mother.  Tr. at 508:3-17.  Najiyah responded that the petitioner was at the apartment; Livingston then took the children to petitioner's aunt's house instead of to their home.  Tr. at 508:15-22.  Livingston and the children arrived at that apartment at around 8:10 p.m. and asked petitioner's aunt, Gloria Tippins, and her daughter, Shauna, to go to the victim's apartment to check on the victim and the petitioner.  Tr. at 540:24–541:22.

According to both Shauna and Gloria, they went straight to the victim's apartment building, which was two buildings down from their own.  Tr. at 542:9-25, 573:12–574:13.  The

two women entered the lobby of the victim's apartment building, which was unlocked, and then walked through a foyer to the stairs to go to the victim's apartment on the second floor. Tr. at 574:17–575:4. They were ascending the stairs when they saw the petitioner on the first-floor landing, coming from the second floor. Tr. at 543:5–544:3, 575:5-10. As he came down the stairs, he told his cousin and aunt he did something "wrong" or "stupid" and he pointed up; he then left the building. Tr. at 544:24–545:7, 575:23–576:7. Shauna and Gloria proceeded to the victim's apartment, where they found the door ajar and discovered the victim's body lying in a pool of blood. Tr. at 545:8-21, 576:12–577:7. The two ran back downstairs to get help. Tr. at 577:8-23. Shauna also ran after the petitioner who was walking away from the building and asked, "what did you do?"; the petitioner "didn't say anything, he just looked back." Tr. at 545:25–546:17. Video recordings reflecting these events, including Livingston going to Gloria's apartment and the Tippinses' encounter with the petitioner, were captured by surveillance cameras in the apartment buildings. *See* Tr. at 549:13–553:8.

Gloria's friend, Glenn Burgess, who lived on the first floor of the victim's apartment building and testified at trial, heard Gloria's voice and called the police at around 8:21 p.m. Tr. at 577:17-21, 606:12–607:24, 610:4-9, 614:3-6. Burgess lived with his sister, Luxzoria Hope, who also testified and apparently heard a female voice coming through the pipes above her saying "help me, help me, this man is killing me" a couple minutes after 8:00 p.m., though she did not share this information with her brother or the police until December of 2006. Tr. at 620:18–622:12, 630:11–631:20, 633:7-11.

By the time the police and the paramedic arrived at 8:30 p.m., the victim was dead. Tr. at 372:14-15, 375:3-19. She had been stabbed four times, twice in her neck and twice in her abdomen; the wound to the carotid artery in her neck was likely the cause of death. Tr. at

374:21–375:24, 405:4-6, 866:3-13, 867:23–869:13.  In addition to the stab wounds, the victim's face was swollen and lacerated, suggesting she had been subject to blunt force trauma; bruises on her arms and legs also suggested she had been forcefully grabbed.  Tr. at 874:8–878:19. Detectives recovered a knife from inside the victim's garbage pail and later matched the DNA on the knife to the victim's DNA, though the petitioner's DNA was not found on the knife's handle. Tr. at 463:1-20, 829:18–830:17, 832:3-11; 843:25–844:6.  One medical examiner, Susan Horan, did however testify that she matched traces of semen on an anal swab taken from the victim to the petitioner's paternal line.  Tr. at 832:3-10, 845:11-14.

Police arrested the petitioner at his mother's house in Philadelphia on November 20, 2006.  Tr. at 690:23–693:25.  When they arrived, petitioner was hiding under a sofa bed.  Tr. at 739:10-741:3.  Detectives questioned petitioner at the police station after he verbally waived his Miranda rights.  Tr. at 694:6–698:16.  Petitioner maintained that he had been in Pennsylvania since before October 31, 2006, but police were aware that he had seen his parole officer on November 1, 2006.  Tr. at 701:19-25, 702:23–704:10.  When pressed about this inconsistency, petitioner claimed that he had gone back to New York on November 1, 2006, and then returned to Pennsylvania.  Tr. at 704:7-22.  Petitioner's parole officer, Robert Chung, testified that he had seen the petitioner on November 1, 2006, but that petitioner did not attend his parole meetings on November 9 and 15.  Tr. at 774:12–776:11.

Defense counsel did not call any witnesses but did press several points when cross-examining the prosecution witnesses and in his summation.  First, he highlighted the fact that the victim never reported the petitioner's supposed prior acts of abuse to the police.  *See* Tr. at 521:1–522:1 (Najiyah), 670:12–671:12 (Cabrera), 924:22–925:5, 935:13–936:6 (summation). Next, he argued that the evidence was insufficient to convict the petitioner because there was

only circumstantial evidence tying petitioner to the victim's death and "[t]here were no eyewitnesses who saw Mr. Johnson kill Asma Johnson."  Tr. at 916:19-22; *see also* Tr. at 908:7-12, 943:3-5.

Defense counsel also questioned the sufficiency of the People's scientific evidence, emphasizing that neither petitioner's fingerprints nor his DNA were found on the murder weapon and that the medical examiners failed to analyze the DNA under the victim's fingernails.  Tr. at 804:22–805:2 (fingerprints), 843:22–844:6 (DNA), 892:3–24 (fingernails); *see also* Tr. at 916:23–917:16 (defendant's summation).  He further revealed through the cross-examination of Shauna and Gloria Tippins that neither of them noticed blood on the petitioner's clothing as he descended the stairs from the victim's apartment even though the victim would have "bl[ed] profusely" when her carotid artery was severed.  Tr. at 564:1–565:10, 598:1–599:1, 910:19-22 (blood on clothes), 893:8–894:12 (victim's bleeding), 928:10–929:7 (summation).  Petitioner was wearing "[a] dark blue sweatshirt, jeans, dark, black boots, and a New York Yankee hat" when Shauna and Gloria saw him.  Tr. at 578:25–579:3.

Finally, as described in more detail below, the defense attempted to place Thomas Livingston under suspicion by revealing that the victim had acquired a protective order against Livingston in 2002 and suggesting that Livingston was conspiring with his daughter, Najiyah, to blame petitioner for the victim's death, which Livingston may have in fact committed; the Court, however, precluded much of this line of inquiry.  Tr. at 362:11–363:16, 518:7-25, 528:22–529:24, 719:9–722:8, 923:1-9.

B.  *The Verdict and Sentencing*

The jury returned a verdict of guilty on both counts on February 11, 2010.  Tr. at 981, 1023:7-19.  On March 25, 2010, Judge Lasak sentenced the petitioner to 25 years to life for murder in the second degree and one year for criminal possession of a weapon in the fourth degree.  Sentencing Tr. at 1, 16:19–20:20, Dkt. 10-8 at ECF pages 106–26.

C.  *Testimony about Prior Uncharged Misconduct*

In addition to the evidence summarized above, Judge Lasak allowed three witnesses—Najiyah, Cabrera, and Angela Willis—to testify about the petitioner's aggression towards the victim on occasions prior to the day the victim was murdered.  In a *Molineux* application at the start of trial, the People argued the petitioner's prior bad acts were "highly probative on issues of intent, motive and identity," Tr. at 173:4-5, and in support of its application relied heavily on *People v. Bierenbaum*, 301 A.D.2d 119 (1st Dep't 2002), Tr. at 173:6–175:10.  Defendant in *Bierenbaum* challenged his conviction for murdering his wife on several grounds, including that the trial court allowed the prosecution to introduce evidence of statements made by the victim "describing defendant's threatening remarks and otherwise negative behavior."  301 A.D.2d at 122.  The court rejected defendant's argument, reasoning that the husband-defendant's prior aggression towards the victim-wife "evince[d] defendant's intent to focus his aggression on one person, namely, his wife—his victim."  301 A.D.2d at 150.  The court further observed:

> [t]hat key factor in the context of marital and other intimate relationships frequently differentiates domestic violence assaults and homicides…from other cases wherein evidence of past assaultive behavior against people other than the victim has most properly been precluded. In the former, the previous aggression principally indicates intent or motive or identity whereas in the latter it can predominantly give rise to inference of propensity…Finally, this evidence shows that this defendant was motivated and had an intent to harm this victim.  There is little or nothing by way of circumstantial evidence that is more relevant or probative in a

circumstantial murder case—especially one involving domestic violence—than [this] type of evidence.

*Bierenbaum*, 301 A.D.2d at 150 (as quoted at Tr. at 174:16–175:10). The People also invoked *Bierenbaum* to argue that a victim's hearsay concerning prior domestic violence may be admissible so long as there are certain indicia of reliability, such as whether statements were made to confidants and friends rather than to police officers or "in an effort to curry favor or get the defendant in trouble." Tr. at 178:7–179:14 (discussing *Bierenbaum*, 301 at A.D.2d at 144–45, and that court's reliance on *Nucci ex rel. Nucci v. Proper*, 95 N.Y.2d 597 (2001)).

Defense counsel argued in response that allowing such testimony would be so prejudicial as to undermine the presumption of innocence. Tr. at 181:2-16. He also attempted to challenge the reliability of the proposed *Molineux* testimony by stressing that it was unbelievable no one had gone to the police to report the alleged abuse. Tr. at 181:17–183:2. Judge Lasak responded by noting that defense counsel's arguments went to weight rather than admissibility. Tr. at 183:3-6. The court then ruled in favor of the People, but reserved its decision concerning Willis's testimony. Tr. at 195:22–197:16.

Najiyah proceeded to testify that the petitioner had pushed his way into the apartment on two occasions in the weeks leading up to the murder without much dispute. However, the admissibility of the victim's hearsay resurfaced at the beginning of Cabrera's testimony when she began to describe a conversation she had with the victim after she heard the petitioner banging on the door of the victim's apartment on November 8, 2006. Tr. 649:5-22. After defense counsel successfully objected to this testimony, the parties met at sidebar to clarify the court's ruling. Tr. at 649:20–650:5. At that point, the prosecution argued that Cabrera's retelling of her conversation with the victim was proper and within the scope of the court's pre-trial *Molineux* ruling. The prosecution again referenced *Bierenbaum* and described that case as

one "where basic hearsay statements by the witness regarding motive and intent w[ere] admitted

as an exception to hearsay and on the issue of motive and intent in a domestic situation."  Tr.

651:1-5.  The court accepted the People's argument, but also held that the witness could not

testify that the petitioner had threatened the victim by saying he would hurt her oldest son

currently at Rikers.  Tr. at 168:13-18, 651:13-21, 652:11-18.

 Following the sidebar, the jury heard Cabrera testify to the following events:

- On November 8, 2006—the day the victim was murdered—Cabrera spoke to the victim over the phone after she saw petitioner banging on the door and yelling "open the f***ing door."  Tr. 648:2–649:17.  The victim asked Cabrera whether petitioner had left, which he had.  Cabrera and the victim then met in the hall and had a conversation, during which the victim revealed that she had been hiding in the closet with her children.  Tr. at 653:12-25, 654:17–655:3.

- On November 7, 2006, Cabrera saw the victim in the hallway and the victim told her that "she was scared and the she was trying to leave [petitioner], but he threatened her." Cabrera then testified to the "nature of the threats," which were that "if [the victim] calls the cops on him or decides to do anything against him…that he would not only hurt her son…he would come back and kill her."  Tr. at 655:17–657:13.

- At some point during the week prior to November 8, 2006, when Cabrera saw the victim throwing out the garbage and noticed her face was bruised, the victim told Cabrera that "Erik hit her."  When Cabrera told her to call the police, the victim said she "couldn't" and that she was "scared."  Tr. at 657:14–658:15.

 During cross-examination, the defense attempted to elicit testimony concerning the

victim and Livingston's prior relationship by questioning Cabrera about her and the victim's

friendship.  Tr. at. 662:22–664:6.  The prosecution objected to this line of questioning and the

court sustained its objection, rejecting defense counsel's argument that the victim may have

confided in Cabrera about the prior relationship with Livingston because they were "close."  Tr.

at 664:8–665:11.  The court reasoned that the basis of Cabrera's knowledge was not her "close"

relationship with the victim but rather her own observations:

> [Cabrera] observed the defendant do certain things in the hallway, okay.  And based on that, they had a conversation.  There was no

confiding, okay.  It was based on the actions that were *observed* by the witness that *caused* the witness to speak to the deceased about what was *happening*.  It wasn't as if they were having a conversation devoid of any observation made by the witness about the actions of the defendant.  There was a reason for that and there was nothing about a close relationship.

Tr. 664:24–665:11 (emphasis added).

Also over defense counsel's objection, the court permitted Willis to recount phone conversations she had with the victim concerning the petitioner's prior conduct toward her.  *See* Tr. at 640:9–641:6.  Willis described the victim as "like a sister," and someone she had spent Christmas and holidays with and known for twenty-six years.  Tr. at 675:4-676:3.  Willis moved from the victim's neighborhood in 2004, but the two remained in touch by speaking by telephone once a week for an hour or two.  Tr. at 676:4-15, 677:14-16.  Willis described the following conversations to the jury:

- In late October, 2006, the victim called Willis at work and told her that "Erik had hit her, beat her."  Willis told the victim to go to the police, but she "said she didn't want to do it because he was on parole."  Tr. at 677:21–678:8.

- Willis testified that, prior to the late October conversation, the victim had "said that [the petitioner] wanted her to change her phone number," that "he ripped her phone out," and that "he was very aggressive and she was afraid of him."  The court sustained defense counsel's objection to these statements and told the jurors to "disregard the testimony"; the court had explicitly prohibited reference to the petitioner ripping the victim's phone out of the wall in its *Molineux* ruling.  Tr. at 640:18-21, 678:9–679:4.

- The prosecution asked if the victim told Willis that petitioner "was becoming possessive," to which Willis responded "yes."  Defense counsel objected to the leading question but the objection was overruled.  Tr. at 679:5-19.

*D.  Witness Thomas Livingston and the Missing Person Charge*

Throughout the trial, the issue of Livingston's testimony was raised repeatedly by defense counsel.  At first, because Livingston was on the People's witness list at the beginning of trial, defense counsel expressed frustration at the People's failure to turn over records relating to

11

Livingston's prior convictions.  Tr. at 335:12-22, 432:14–434:23, 720:11.  Defense counsel argued that he needed these records to effectively cross-examine the witness.  Tr. at 344:7-13, 432:23–433:5.  Following Najiyah's testimony, defense counsel was still unable to acquire certain records involving Livingston's "criminal court arrests and convictions which…[were] essential to cross examination."  Tr. at 532:8–534:1.  As a result, the defense asked that "Mr. Livingston be precluded from testifying because [of] the Sixth Amendment right to confrontation" and the "fundamental right to cross examine all witnesses presented at trial."  Tr. at 534:6-19.  The court denied the application to preclude Livingston from testifying.  Tr. at 535:9-12.  The prosecution, though, never called him as a witness.

The People's decision to not call Livingston to testify came out during the defense's cross-examination of Detective Robert Edwin, when defense counsel attempted to elicit testimony concerning a prior assault conviction Livingston received for striking the victim.  Tr. at 719:9–721:19.  The court told defense counsel that he could not bring out this history through the detective and said that he was "free to call Mr. Livingston if [he] want[ed] to get [the prior assault] out."  Tr. at 720:16-17, 722:3-5.  Defense counsel dismissed that solution, asking "[w]hat am I going to do ask him about his record and sit down?  I would be in a very bad position to do that and not ask him about anything else"; the court responded by precluding the inquiry.  Tr. at 722:5-10.

Following this ruling, and before the People called its final witness, defense counsel requested a missing witness charge due to the prosecution's "failure to call a necessary and material witness."  Tr. at 856:2-20.  The defense argued that Livingston was a material witness because he made a "series of phone calls and conferred with Asma Johnson up until 8:00 P.M." and because the People told the jury they would hear from Livingston at the start of trial.  Tr. at

856:2-20, 858:12-20.  The People argued that all references to facts involving Livingston in its opening statement "w[ere] covered by Najiyah Livingston" and that "any piece of circumstantial evidence that [Livingston] may have was already testified to by his daughter who…is a better witness."  Tr. at 856:21–858:11.  The court denied the application for a missing witness charge. Tr. at 912:2-4.

Ultimately, the jury did not hear from Livingston, but they did hear his statements through the testimony of other witnesses:

- Najiyah testified that her dad—Livingston—asked her while they were in the car driving back to the victim's apartment "who was there when [they] left" and told her "that [her] mom said…to not bring [them] home."  When they arrived at the Tippinses' apartment, Najiyah testified that her dad told petitioner's aunt that "[petitioner] is causing all types of problems, and that she should make him leave."  The court allowed the statement made in the car to be received in evidence over defense counsel's objection; defense counsel did not object to the second statement.  Tr. at 508:3–509:8.

- Shauna testified that Livingston "said that [petitioner] Erik Johnson and [the victim] Miss Johnson [were] arguing, and [asked] for [her and her mother] to go over there."  The court allowed this testimony over defense counsel's hearsay objection.  Tr. at 541:10-22.

- Gloria testified that when they left to go to the victim's apartment, Livingston and his kids "stayed behind because he said he was parked…on 21 street."  Defense counsel successfully objected to this conversation.  Tr. at 574:7-11.

Defense counsel addressed the prosecution's decision not to call Livingston in his summation.  He posed the following questions to the jury: "Did Mr. Livingston tell you that he stayed with his daughter throughout the time when the math games were going on?  Why didn't Mr. [Livingston][5] not testify?  Was he concerned about his relationship with his ex-girlfriend that may have come out during this trial?"  The court sustained the People's objection to this portion of the summation.  Tr. at 923:1-9.

---

[5] The transcript says "Mr. Johnson" but the context makes clear that defense counsel meant to refer to Mr. Livingston's failure to testify.

## II.      Direct Appeal

Petitioner timely appealed his conviction to the Appellate Division, Second Department. Abbot Aff. ¶ 27.  On appeal, he made the following arguments: 1) his right to a fair trial was denied when the court refused to give a missing witness charge concerning Livingston; and 2) his rights to cross-examination and to a fair trial were denied when the court improperly allowed the People to introduce hearsay testimony that the petitioner abused and threatened to kill the victim and that he was in the victim's apartment shortly before her body was discovered.  Pet.'s Appellate Br. at 16, 26, Dkt. 10-1 at ECF pages 1–41.  Petitioner's first claim referenced the Fourteenth Amendment to the U.S. Constitution, while his second claim referenced the Fourteenth and Sixth Amendments to the U.S. Constitution as well as New York State constitutional provisions.  *Id.*  In two footnotes, petitioner also raised the possibility that his trial counsel provided him with ineffective assistance of counsel under state and federal standards. Specifically, with respect to the missing witness charge, petitioner wrote, "[s]hould this Court find that counsel's request [for a missing witness charge] was not sufficiently argued, it should find that this deficiency constituted ineffective assistance of counsel." *Id.* at 25 n. 6.  Similarly, at the conclusion of the arguments concerning the admission of hearsay, petitioner asked the court to,

> [a]lternatively…reverse and grant a new trial based on defense counsel's ineffectiveness for not arguing that the hearsay from Cabrera and Willis did not fit within a recognized exception to the hearsay rule, and for failing to specifically argue that Najiyah's and Shauna's testimony concerning appellant's presence in Johnson['s] apartment was hearsay.

*Id.* at 37 n. 9.[6]

---

[6] Petitioner was represented by new counsel on appeal.

The Appellate Division affirmed the petitioner's conviction in a short opinion on May 23, 2012. *Johnson,* 95 A.D.3d 1237. The Appellate Division concluded that any error by the trial court "in denying the defendant's request for a missing witness charge" or "admitting certain hearsay testimony of third parties" was harmless, "as there was overwhelming evidence of the defendant's guilt and no significant probability that the error contributed to his conviction." *Id.* The court also noted that the petitioner's "remaining contention [was] without merit," presumably referring to the ineffective assistance counsel claims. *Id.*

In two letters, petitioner sought review in the New York Court of Appeals. The first requested that the court "consider and review all issues raised" in the petitioner's appellate brief. Pet.'s Ltr. dated May 31, 2012, Dkt. 10-1 at ECF pages 115–16. In the second, petitioner's appellate counsel wrote to supplement the appellate briefs and "to explain why this case is particularly appropriate for review by the Court." Pet.'s Ltr. dated Aug. 6, 2012, at 1, Dkt. 10-1 at ECF pages 117–19. Counsel argued that the Court of Appeals had never before addressed "whether hearsay that appellant abused and threatened to kill the deceased, who wanted to end their relationship, is admissible as background evidence." *Id.* The letter acknowledged that a defendant's prior bad acts against the victim may be probative of motive and intent in domestic violence cases, and therefore admissible, but emphasized that hearsay is still "not admissible simply because it may be shown to be 'reliable' without regard to whether it fits into a recognized exception." *Id.* at 1–2.

On August 9, 2012, petitioner was denied leave to appeal by the Court of Appeals. *People v. Johnson*, 19 N.Y.3d 997 (2012).[7]

---

[7] This Order may also be found at ECF page 125 of Dkt. 10-1.

DISCUSSION

I.    **AEDPA's Procedural Requirements**

Federal court review of petitioner's challenges to his state court conviction is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Before reaching the merits of the petition, I review AEDPA's procedural requirements.

*A.  Statute of Limitations*

AEDPA requires that a state prisoner file a petition for a writ of habeas corpus within one year of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). The judgment in petitioner's case became final ninety days after the New York Court of Appeals denied leave to appeal because he did not petition for a writ of certiorari to the United States Supreme Court. *McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir. 2003). Thus, petitioner's conviction became final on November 7, 2012, or ninety days after the Court of Appeals issued its order denying leave to appeal on August 9, 2012. Because the petitioner filed his petition on July 25, 2013, his petition was timely filed. Dkt. 1.

*B.  Exhaustion*

Under AEDPA, petitioners who are serving state sentences must exhaust all available state court remedies before a federal habeas court may review the merits of their claims. *See* 28 U.S.C. § 2254(b); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). To exhaust state remedies, a petitioner must "(i) present[] the federal constitutional claim asserted in the [habeas] petition to the highest state court (after preserving it as required by state law in lower courts) and (ii) inform[] that court (and lower courts) about both the factual and legal bases for the federal claim." *Ramirez v. Att'y Gen. of St. of N.Y*, 280 F.3d 87, 94 (2d Cir. 2001).

16

"Exhaustion does not require citation of 'book and verse of the federal constitution.'"
*Jackson v. Edwards*, 404 F.3d 612, 619 (2d Cir. 2005) (quoting *Picard v. Connor*, 404 U.S. 270, 278 (1971)).  For example, "even 'a minimal reference to the Fourteenth Amendment'" or claim that a petitioner was "deprived of a fair trial" is sufficient to alert a state court to a petitioner's claim that he was denied his federal right to a fair trial.  *Adamson v. Griffin*, 2016 WL 6780011, at *6 (S.D.N.Y. Nov. 16, 2016) (quoting *Reid v. Senkowski*, 961 F.2d 374, 376 (2d Cir. 1992)). A petitioner may also exhaust federal constitutional claims in state proceedings by:

> "(a) rel[ying] on pertinent federal cases employing [federal] constitutional analysis; (b) rel[ying]   on state cases employing [federal] constitutional analysis in like fact situations; (c) asserti[ng] [] the claim in terms so particular as to call to mind a specific right protected by the Constitution; and (d) alleg[ing] [] a pattern of facts that is well within the mainstream of constitutional litigation."

*Adamson*, 2016 WL 6780011, at *4 (quoting *Smith v. Duncan*, 411 F.3d 340, 348 (2d Cir. 2005)).  The flexibility underlying the exhaustion requirement reflects the idea that "exhaustion is not intended to exhaust the petitioner or his or her lawyers," but rather to ensure that "the state court has a fair and meaningful chance to grant relief on what is substantially the same claim raised in [the] federal [habeas proceeding]."  *Jones v. Keane*, 329 F.3d 290, 295 (2d Cir. 2003).

In New York, a defendant seeking review of a decision of the Appellate Division must do so by applying for leave to appeal by letter application to the Court of Appeals.  *Harris v. Fischer*, 438 F. App'x 11, 13 (2d Cir. 2011).  A petitioner who presents his federal claims to the Appellate Division and is denied leave to appeal to the state's highest court meets the exhaustion requirement if his "leave application 'clearly state[s] that he [is] pressing all of the claims raised in [an] attached [Appellate Division] brief.'"  *Id.* (quoting *Jordan v. Lefevre*, 206 F.3d 196, 199 (2d. Cir. 2000)).

Here, in seeking leave to appeal the Appellate Division's ruling, petitioner asked the Court of Appeals to review each of the claims raised in his appellate brief. *See* Pet.'s Ltr. dated May 31, 2012; Abbot Aff. ¶ 34. Petitioner has therefore satisfied AEDPA's exhaustion requirement with respect to the claims he raised before the Appellate Division, including that he was denied a fair trial due to the trial court's refusal to give a missing witness charge and its decision to admit hearsay testimony regarding petitioner's prior misconduct, and that he was denied the effective assistance of trial counsel. *See* Pet.'s Appellate Brief.

### C. Procedural Bar—Independent and Adequate State Grounds

Respondent nevertheless contends that several of the arguments raised in the habeas petition—including petitioner's ineffective counsel and Confrontation Clause claims—were left out of petitioner's appellate brief and are, as a result, procedurally barred from collateral review. Opp. to Pet. for a Writ of Habeas Corpus ("Opp.") at 18, 21, 42–45, Dkt. 8.

It is well established that, except in limited circumstances, federal habeas relief is foreclosed where a state prisoner's federal claim was defaulted in state court pursuant to an independent and adequate state law procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "Under such circumstances, a federal court will deem the claim exhausted, but treat review of the merits as procedurally barred." *Hernandez v. Senkowski*, 1999 WL 1495443, at *9 (E.D.N.Y. Dec. 29, 1999). Thus, "[f]or exhaustion purposes, 'a federal habeas court need not require that a[n unexhausted] federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'" *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (citing *Harris v. Reed*, 489 U.S. 255, 263 n. 9 (1989)).

A petitioner may procedurally default a claim by failing to raise it on direct appeal. *Pearson v. Rock*, 2015 WL 4509610, at *8 (E.D.N.Y. July 24, 2015). The Second Circuit has

held that "New York law prohibit[ing] review of a claim on collateral review when the defendant unjustifiably fails to raise the claim on direct appeal" is an adequate and independent state procedural bar. *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001). "'Once a claim is found to be procedurally defaulted, a federal court may grant habeas relief on such claim only if the petitioner has demonstrate[d] cause for the default and prejudice from the asserted error,' or a 'fundamental miscarriage of justice.'" *DeVaughn v. Graham*, 2017 WL 244837, at *6 (E.D.N.Y. Jan. 19, 2017) (citation omitted).

Here, as noted above, petitioner raised two ineffective counsel claims in the footnotes of his appellate brief. Respondent acknowledges that those claims have been exhausted, *see* Opp. at 29–30, 40, but argues that "some of petitioner's [habeas] arguments regarding the effectiveness of his counsel cannot be considered here because he never raised them in state court." Abbot Aff. ¶ 38. Specifically, respondent contends that the following arguments are unexhausted: that petitioner's trial attorney

> failed to preserve a claim that the evidence was legally insufficient; failed to substantiate his objections; stumbled with words to the jury and at sidebars; failed to argue constitutional standards or make a followup argument for the missing witness application; failed to supplement his arguments or objections with case law; and that a review of the entire record demonstrates his ineffectiveness.

Opp. at 20; *see also* Habeas Pet. at 32–33. Indeed, the two footnotes raising an ineffective counsel claim in petitioner's appellate brief are not as extensive as the claim in his habeas petition. *See* Pet.'s Appellate Br. at 25 n. 6 (regarding request for missing witness instruction), 37 n. 9 (regarding hearsay objections).

However, because petitioner's habeas claims concerning trial counsel's ineffective performance "supplement[], but do[] not fundamentally alter" the "[ineffective counsel claim] presented to state courts," those claims are properly exhausted and reviewable on the merits.

*Caballero v. Keane*, 42 F.3d 738, 741 (2d Cir. 1994); *Hemphill v. Senkowski*, 2004 WL 943567, at *12–*13 (S.D.N.Y. May 3, 2004) (applying *Caballero* to find that the "numerous" ineffective counsel claims raised in the habeas proceeding merely supplemented the singular ineffective counsel claim made in state court because the new claims related to the same underlying argument). Most of petitioner's ineffective counsel claims are so broad that they do not concretely, or "fundamentally," alter his original ineffective assistance claims. For example, petitioner's argument that his attorney failed to substantiate or supplement his arguments with case law is simply an example of why petitioner claimed before the Appellate Division that the missing witness charge request "was not sufficiently argued" or that trial counsel should have more aggressively opposed the hearsay testimony offered by the prosecution. *See* Pet.'s Appellate Br. at 25 n. 6, 37 n. 9.

Respondent next argues that petitioner procedurally defaulted his claim that the People's failure to call Livingston as a witness violated his right under the Confrontation Clause of the Sixth Amendment.[8] *See* Opp. at 42–45. Related to this claim, respondent insists that the Court should not consider the exhibits attached to the habeas petition, which include grand jury minutes, a copy of the statement Livingston made at the police station, and pretrial hearing minutes, because these exhibits were not included in the state record. *Id.* at 46; *see* Habeas Exs., Dkt. 1 at ECF pages 36–71.

The Court agrees. Not once did petitioner mention the Confrontation Clause of the Sixth Amendment in his appellate brief. Petitioner's argument with respect to the missing witness charge was instead made entirely in the context of his Fourteenth Amendment right to a fair trial. *See* Pet.'s Appellate Br. at 16. Petitioner's appellate brief does in one instance arguably hint at

---

[8] Petitioner's Confrontation Clause argument is found in the "missing witness charge" section, or under the "Point One" heading, of the habeas petition. *See* Habeas Pet. at 20–25.

the Confrontation Clause issue by characterizing Livingston's statements concerning petitioner's presence in the victim's apartment as "an accusation by [Livingston] a non-testifying witness" and citing to *People v. Barboza*, 24 A.D.3d 460 (2d Dep't 2005), a case holding that a Confrontation Clause argument was without merit.  Pet.'s Appellate Br. at 33–34.  However, this fleeting reference did not provide the state court with a "fair and meaningful" opportunity to consider any federal Confrontation Clause claim.

For one, the reference to Livingston as a "non-testifying witness" was made in the context of the argument that Livingston's hearsay statements were improperly admitted under state evidence law.  *See* Pet.'s Appellate Br. at 31–35.  Thus, it cannot be said that the reference was "so particular as to call to mind" the right of confrontation.  *See Corchado v. Rabideau*, 576 F. Supp. 2d 433, 453–54 (W.D.N.Y. 2008) (collecting cases suggesting that "a hearsay objection or claim does not automatically 'call to mind' the Sixth Amendment's Confrontation Clause.").  In addition, the brief's citation to *Barboza* may not have alerted the Appellate Division to petitioner's federal right.  Though the defendant in *Barboza* claimed that he was denied the right of confrontation by the testimony of a police detective, the brief opinion relies on state and not federal cases.  As a result, this citation may have flagged only petitioner's state right of confrontation—if it flagged any confrontation issue at all.  *See* N.Y. Const. art. I, § 6; *see also Ildefonso v. Wendland*, 2019 WL 7484053, at *8 (N.D.N.Y. Oct. 31, 2019), *report and recommendation adopted*, 2020 WL 58674 (N.D.N.Y. Jan. 6, 2020) (concluding that federal claim had not been exhausted even though the petitioner had cited some New York cases which did in fact "primarily rel[y]" on the federal standard because "petitioner did not cite these cases to invoke any federal analysis of his own claims, nor do the cases themselves invoke a constitutional analysis of factually similar claims").

Thus, because petitioner failed to exhaust his Confrontation Clause claim in state proceedings and offers no grounds that might excuse his procedural default,[9] his Confrontation Clause claim is procedurally barred from habeas review.  In addition, petitioner's attempt to supplement the record by attaching exhibits to his habeas petition is prohibited under *Cullen v. Pinholster*, 563 U.S. 170, 181, (2011) (limiting the record before a federal habeas court "to the record that was before the state court that adjudicated the claim on the merits").

I nevertheless review each of the petitioner's claims on the merits.  *See* 28 U.S.C. § 2254(b)(2); *Aparicio*, 269 F.3d at 90 n. 5 ("AEDPA permits a habeas court to reject a claim on the merits notwithstanding the fact that it is unexhausted.").  For the reasons set out below, I respectfully recommend denying the habeas petition in its entirety.

## III.    Petitioner's Claims for Habeas Relief

### A.  Legal Standards

Pursuant to AEDPA's deferential standard, a federal court may not grant a writ of habeas corpus to a state prisoner on a claim that was adjudicated on the merits in state court,

> unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Price v. Vincent*, 538 U.S. 634, 639–40 (2003).

---

[9] Though petitioner raises an ineffective assistance of counsel claim, which may excuse procedural default if it "causes" the default, *Mizell v. United States*, 2020 WL 2216561, at *3 (S.D.N.Y. May 6, 2020), petitioner does not present his ineffective counsel claim as the cause of his procedural default.  Even if he had, it would not change the outcome.  "A defense counsel's ineffectiveness in failing to properly preserve a claim for review in state court can suffice to establish cause for a procedural default only when the counsel's ineptitude rises to the level of a violation of a defendant's Sixth Amendment right to counsel."  *Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001).  Here, as explained below, petitioner was not denied effective assistance of counsel under federal standards.  In addition, petitioner claims that only his trial counsel provided ineffective assistance, though his appellate counsel is at least in part responsible for the decision not to raise the Confrontation Clause issue in the appellate brief.

Thus, under AEDPA's first prong, a federal habeas court may not issue a writ simply because it decides that the state court applied Supreme Court precedent incorrectly. *Price*, 538 U.S. at 641. Rather,

> [u]nder the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). An incorrect application of federal law will not necessarily be an unreasonable one. *See Grayton v. Ercole*, 691 F.3d 165, 174 (2d Cir. 2012) ("[T]he writ may only issue where the state court's application of the law was not only wrong, but unreasonable.").

The second prong of AEDPA presumes a state court's factual findings to be correct. Factual determinations by a state court may be held to be "unreasonable" only where the petitioner rebuts the presumption of correctness "by clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1); *Cummings v. Lee*, 2013 WL 5744465, at *21 (E.D.N.Y. Oct. 23, 2013).

### B.  Missing Witness Charge

Petitioner's argument concerning the trial court's failure to give a missing witness charge implicates the Fourteenth Amendment right to a fair trial and the Sixth Amendment right of confrontation. These arguments are made under the "Point One" heading of petitioner's habeas memorandum. *See* Habeas Pet. at 20–25.

1. Denial of Fair Trial

Petitioner argues that the trial court's refusal to give a missing witness charge instructing the jury to draw an adverse inference from the People's decision not to call Livingston to testify denied him a fair trial. *See* Habeas Pet. at 23–24. He claims that the trial court's ruling was incorrect because Livingston, as the last person to speak to the victim, was a material witness of "prime importance" who was present in the courtroom and available to testify.[10] *Id.* at 21, 24.

Because the Appellate Division's dismissal of this claim as "harmless" was based on the merits, it is entitled to AEDPA deference. *See Davis v. Ayala*, 576 U.S. 257, 269 (2015) (noting that the state court's finding that any federal error was harmless "undoubtedly constitutes an adjudication of [petitioner's] constitutional claim 'on the merits'"). Moreover, "[w]hen a federal court reviews a state court finding of harmless error beyond a reasonable doubt under AEDPA, 'a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable.'" *Troche v. LaManna*, 2019 WL 2619339, at *3 (E.D.N.Y. June 26, 2019) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)).

This claim is without merit. As an initial matter, "[t]here is 'no clearly established Supreme Court precedent requiring a trial court to instruct the jury with respect to a missing witness.'" *Adamson*, 2016 WL 6780011, at *6 (quoting *Morales v. Strack*, 2003 WL 21816963 at *4 (E.D.N.Y. July 3, 2003), *aff'd*, 116 F. App'x 293 (2d Cir. 2004)). Rather, "[t]he propriety of a state court's jury instruction is ordinarily a state law matter that does not raise a federal question." *Gonzales v. People*, 2006 WL 2506472, at *2 (S.D.N.Y. Aug. 30, 2006). Petitioner's

---

[10] To obtain a missing witness charge under New York law, a party must demonstrate that 1) the witness has material knowledge, 2) the witness would be expected to give noncumulative testimony favorable to the party who declined to call the witness, and 3) the witness is available to the party declining to call the witness. *Garcia-Lopez v. Fischer*, 2007 WL 1459253, at *9 (S.D.N.Y. May 17, 2007), *as amended* (May 18, 2007) (quoting *People v. Sauvignon*, 100 N.Y.2d 192, 197 (2003)).

claim is therefore "cognizable on federal habeas review only if [he] can show 'not merely that

the instruction [was] undesirable, erroneous, or even "universally condemned," but that it

violated some right which was guaranteed to the defendant by the Fourteenth Amendment.'"

*Quinones v. Artus*, 2013 WL 5502870, at *7 (E.D.N.Y. Sept. 30, 2013) (quoting *Cupp v.

Naughten*, 414 U.S. 141, 146 (1973)).  A trial court's "discretionary decision not to give the

instruction" will warrant habeas relief only if the decision "by itself so infect[s] the entire trial

that the resulting conviction violates due process."  *Dell v. Ercole*, 2009 WL 605188, at *6

(E.D.N.Y. Mar. 6, 2009).

      Here, the trial court's refusal to give a missing witness charge was not error under state or

federal law, much less error that infected the fairness of the trial.  "[W]here a witness is equally

available to both sides, a missing witness charge is 'inappropriate.'"  *United States v. Caccia*,

122 F.3d 136, 139 (2d Cir. 1997); *see also United States v. Pierce*, 785 F.3d 832, 843–44 (2d

Cir. 2015) (holding it was not error to refuse a missing witness instruction when defense

acknowledged at trial that it had "an equal opportunity" to call the witness at issue); *Dell*, 2009

WL 605188, at *6 (failure to call witness "not a 'missing-witness' trigger" where witness was

not "'missing,' but present and available to testify"); *People v. Costa*, 183 A.D.2d 722, 723 (2d

Dep't 1992) (missing witness charge properly denied where witness was equally available to

defendant*).  Livingston was available to be called by either the prosecution or defense, and it was

only for tactical reasons that defense counsel declined to call him.  *See* Tr. at 722:3-10 ("What

am I going to do ask him about his record and sit down?  I would be in a very bad position to do

that and not ask him about anything else.").  The trial court's decision not to provide a missing

witness instruction was therefore appropriate.

Even assuming that the trial's court's decision was made in error, it did not "so infect" the trial as to deprive petitioner of due process. As the Appellate Division reasonably concluded, "there was overwhelming evidence of the defendant's guilt and no significant probability that the error contributed to his conviction." *Johnson,* 95 A.D.3d at 1237. Petitioner told his cousin and aunt that he did something "wrong" or "stupid" as he descended the stairs from the victim's apartment immediately prior to the discovery of the victim's body. *See* Tr. at 542–45, 573–77. A missing witness charge—either given or withheld—would have not changed the outcome of petitioner's trial. *See Cupp*, 414 U.S. at 146–47 (noting that courts "determining effect of [an] instruction on the validity of respondent's conviction" should be mindful that "a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge").

Finally, even if there had been prejudice, it would have been mitigated by defense counsel's arguments in summation. *See Guerrero v. Payant*, 2010 WL 2545818, at *26 (E.D.N.Y. June 21, 2010) (holding that defense counsel's argument about the prosecution's failure to call a witness in summation "alleviated any potential error in the court's failure to issue a missing witness charge"); *Brown v. Spitzer*, 2007 WL 2406870, at *3 (E.D.N.Y. Aug. 21, 2007) ("[C]ounsel's closing argument as to an allegedly missing witness cures the failure to charge, if one would be required.").

## 2. Confrontation Clause

Petitioner argues that the trial court's refusal to either require Livingston to testify or give a missing witness charge violated his Sixth Amendment right of confrontation as well. Habeas Pet. at 21. Specifically, petitioner contends that the trial court's admission of Livingston's statements that the victim said not to bring the children home, that petitioner was "causing all

26

types of problems," and that the victim and petitioner were arguing, violated his right of confrontation. Habeas Pet. at 22; *see* Tr. at 508:3–509:8, 541:10-25. Petitioner submits exhibits in support of this argument, including the People's witness list, a copy of the statement Livingston made at the police station, grand jury minutes, and pre-trial minutes. *See* Habeas Exs. The exhibits show that Livingston told the police that the victim was having a "bad relationship" with petitioner and that when Livingston called the victim on his way to the apartment she told him not to bring the kids home and that "he" was there, *id.* at 37, that Livingston identified the petitioner "after viewing a photo array," *id.* at 60–61, and finally that Livingston implicated petitioner before a grand jury, *id.* at 38–55.

Petitioner's Confrontation Clause claim is, as discussed above, procedurally barred. I nevertheless reach the claim and, for the reasons stated below, conclude that it lacks merit.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36, 50–51 (2004), the Supreme Court held that the Confrontation Clause applies not only to in-court testimony, but also to out-of-court statements introduced at trial. Still, "not all hearsay implicates the Sixth Amendment's core concerns," *id.* at 51; rather, "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006). "[T]he inquiry under the Confrontation Clause is [therefore] whether the statement at issue is testimonial…If so, the Confrontation Clause requirements of unavailability and prior cross-examination apply. If not, the Confrontation Clause poses no bar to the statement's admission." *United States v. Feliz*, 467 F.3d 227, 232 (2d Cir. 2006).

"An out-of-court statement is testimonial if the 'primary purpose' underlying it was to establish an evidentiary record in a manner that might reasonably be expected to be used in a later legal proceeding." *United States v. Ramos*, 622 F. App'x 29, 30 (2d Cir. 2015) (quoting *Bullcoming v. New Mexico*, 131 S.Ct. 2705, 2720 (2011) (Sotomayor, J., concurring)); *see also Davis*, 547 U.S. at 828 (characterizing testimonial out-of-court statements as "a weaker substitute for live testimony at trial" (internal quotation marks and citation omitted)).  In contrast, non-testimonial statements are "neither solicited by any law enforcement officers nor made in the context of any government investigation."  *Ko v. Burge*, 2008 WL 552629, at *10 (S.D.N.Y. Feb. 26, 2008).  Most statements made in the ordinary course of life, such as a "happenstance" remark to a "friend and confidant" or a comment made during a phone call with a family member, are non-testimonial.  *United States v. Brow*n, 441 F.3d 1330, 1360 (11th Cir. 2006); *United States v. Franklin*, 415 F.3d 537, 545–46 (6th Cir. 2005); *see also United States v. Manfre,* 368 F.3d 832, 838 n. 1 (8th Cir. 2004) ("[Declarant]'s comments were made to loved ones or acquaintances and are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks.").

Here, the statements Livingston made to police and before the grand jury are clearly testimonial.  These statements, though, were not introduced at trial and accordingly are not the basis of petitioner's claim.  The statements that were introduced at trial, in contrast, were *not* testimonial and their admission therefore did not violate petitioner's Confrontation Clause rights.  Livingston's statement to his daughter as he drove her home was initially nothing more than a logistical conversation concerning where to bring her and her brother.  The sequence of events further demonstrates that Livingston's statements that the petitioner was causing "problems" and was arguing with the victim were made to elicit the Tippinses' help and to explain why Shauna

28

and Gloria should check on the victim and petitioner.  It also seems likely that Livingston felt there was an ongoing emergency after speaking to the victim, and that his statements at the Tippinses' apartment were made for the "primary purpose" of addressing that emergency as it was happening.  *See Davis*, 547 U.S. at 827 (finding the declarant's statements made in the course of an ongoing emergency to be non-testimonial because the witness "was speaking about events *as they were actually happening*," and "the nature of what was asked and answered…was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford* ) what had happened in the past").

Finally, "even assuming arguendo that petitioner's Confrontation Clause rights were violated…such a violation is subject to harmless error review."  *Sims v. Artus*, 2019 WL 3718024, at *8 (E.D.N.Y. Aug. 7, 2019); *see also United States v. Caraballo*, 658 F. App'x 595, 598–99 (2d Cir. 2016).  "[O]n habeas review of a state conviction, a constitutional error will be considered harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Black v. Griffin*, 2019 WL 2551685, at *28 (S.D.N.Y. Jan. 14, 2019), *report and recommendation adopted*, 2019 WL 2548132 (S.D.N.Y. June 20, 2019) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).  Here, the overwhelming evidence, presented through the testimony of witnesses who testified at the trial and were subject to cross-examination, established not only that the petitioner and the victim had an abusive relationship but also that the petitioner admitted doing something "wrong" or "stupid" as he was seen leaving the victim's apartment just before her body was discovered, in an exchange captured by video surveillance footage.  *See* Tr. at 542–45, 549–53, 573–77.  Livingston's three statements in the face of such incriminatory evidence were unlikely to have had a "substantial…influence in determining the jury's verdict."

For all these reasons, the Appellate Division's rejection of petitioner's missing witness charge claim was neither contrary to, nor based on an unreasonable application of, clearly established federal law.  Petitioner's arguments under the "Point One" heading should therefore be denied.

### C.  Admission of Hearsay as to Prior Uncharged Misconduct

Petitioner's second claim, found under the "Point Two" heading of his memorandum, challenges the trial court's admission of testimony concerning the victim's statements to others about his prior bad acts, which he refers to as uncharged crimes.  Habeas Pet. at 26–31.  In addition, mindful of the Court's "duty to construe liberally papers filed by *pro se* litigants," *see Jennis v. Rood*, 310 F. App'x 439, 441 n. 1 (2d Cir. 2009), and because petitioner brings his second claim under both the Sixth and the Fourteenth Amendment, I interpret petitioner's hearsay argument as encompassing a separate claim that the state court's evidentiary rulings violated his rights under the Confrontation Clause.

#### 1.  Evidentiary Rulings

Petitioner argues that he was denied a right to a fair trial due to the court's evidentiary rulings, which admitted 1) hearsay testimony about statements made by the victim 2) describing petitioner's prior bad acts, or attributing uncharged offenses to him.  Habeas Pet. at 26.  Specifically, petitioner argues that the victim's friends' testimony about his prior uncharged bad acts was intended to show his propensity for violence, and that this evidence may have induced the jury to convict him "because of his past."  *Id.* at 26–29.  Again, because the Appellate Division deemed the trial court's admission of "certain hearsay testimony of third parties" harmless, the state court's ruling is entitled to AEDPA deference.

Petitioner's claim that he is entitled to habeas relief because the trial court made erroneous evidentiary rulings should be denied. "[S]tate evidentiary determinations are generally a matter of state law and not subject to habeas review." *Basagoitia v. Smith*, 2012 WL 4511358, at *5 (E.D.N.Y. Sept. 30, 2012). "Challenges to the admissibility of evidence are cognizable on federal habeas review only if the petitioner can establish that the decision to admit the evidence rendered the trial so fundamentally unfair as to deny him or her due process of law." *Riedel v. Perez*, 2012 WL 3598829, at *14 (E.D.N.Y. Aug. 15, 2012) (citing *Freeman v. Kadien*, 684 F.3d 30, 35 (2d Cir. 2012)). Thus, "[t]he erroneous admission of evidence rises to a deprivation of due process under the Fourteenth Amendment only if the evidence in question 'was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Cox v. Bradt*, 2012 WL 2282508, at *15 (S.D.N.Y. June 15, 2012) (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)).

The evidence of prior misconduct challenged by petitioner was properly admitted at his trial. Under New York law, "a trial justice…[may] allow[] a jury to hear about a defendant's prior bad acts—be they violent or otherwise—if they shed light on the issues of intent, identity, motive, absence of accident or mistake, or common plan and scheme." *People v. Bierenbaum*, 301 A.D.2d 119, 149 (1st Dep't 2002) (citing *People v. Molineux*, 168 N.Y. 264, 293 (1901)).[11] In domestic violence cases, proof of prior assaults and threats is particularly relevant "not only to issues of identity and intent, but also 'to provide background information concerning the context and history of [the] defendant's relationship with the victim.'" *Burkett v. Artus*, 2016 WL 6659492, at *12 (N.D.N.Y. Nov. 10, 2016) (quoting *People v. Wertman*, 114 A.D.3d 1279, 1280 (4th Dep't 2014)).

---

[11] Federal law governing the admissibility of crimes, wrongs, and other bad acts is similar. *See* Fed. R. Evid. 404(b).

Here, the testimony concerning the petitioner's prior misconduct, including that he had aggressively pushed his way into the victim's apartment, pushed her so hard she bruised her leg, and hit her, *see* Tr. at 502–07, 653–58, 677–79, was properly admitted under *Molineux* to show "that this defendant was motivated and had an intent to harm *this* victim," and not merely that petitioner had a general propensity for violence.[12]  *Bierenbaum*, 301 A.D.2d at 150 (emphasis added).  Moreover, courts have found in domestic violence cases that the probative value of such evidence exceeds its potential for prejudice.  *See, e.g., People v. Flowers*, 245 A.D.2d 1088, 1088 (4th Dep't 1997).  It seems, then, that the admission of petitioner's prior misconduct was permissible under state law.

New York law concerning the admission of *statements* made to third parties by a victim of domestic violence was, however, less clear at the time of petitioner's trial in 2010.  The People relied on *Bierenbaum* at trial to argue that the victim's statements to Cabrera and Willis that petitioner had hit and threatened her, *see* Tr. at 653–58, 677–79, were admissible under a "background exception" to the hearsay rule, which allows "basic hearsay statements…on the issue of motive and intent in a domestic situation."  Tr. 650:6–651:7; *see also Bierenbaum*, 301 A.D.2d at 144–47.[13]  The People argued further that a victim's hearsay should be admitted under the "background exception" when it carries certain indicia of reliability.  *See* Tr. at 178–79; *see also* Opp. at 66–67.  The trial court accepted both arguments without much discussion.  *See* Tr. at 652–53.

---

[12] The trial judge instructed the jury accordingly, explaining that the prior offenses "must not be considered for the purpose of proving that the defendant had a propensity or predisposition to commit the crime" but only considered "on the question of intent, motive or identity of the perpetrator."  Tr. at 991:17–992:2.

[13] The victim's statements do not appear to have been excited utterances or to fall within any other well-established exception to the hearsay rule.

However, other New York courts have rejected the notion of a "background exception" that allows hearsay testimony relating statements made by a victim of domestic violence to be admitted. *See People v. Harvey*, 270 A.D.2d 959, 960 (4th Dep't 2000). Indeed, in *People v. Maher*, 89 N.Y.2d 456, 460–61 (1997), the Court of Appeals held that the lower court was wrong to admit a victim's hearsay statements concerning the defendant's abuse. In so holding, the court rejected the lower court's "unwarranted expansion" of a narrow hearsay exception, intended only to prevent witness tampering, into "a categorical authority for the admissibility of victims' statements in all homicide cases." *Id.* at 461. It therefore seems that the trial court may have erred in accepting the People's purported "background exception" and in admitting the victim's statements through Cabrera's and Willis's hearsay testimony.[14]

Even so, "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Here, the victim's statements were surely significant, but they did not provide the "basis for conviction or [] remove a reasonable doubt that would have existed on the record without" them. *Cox*, 2012 WL 2282508, at *15. Absent the victim's statements, the jury would have heard the Tippinses testify that they saw petitioner descending from the victim's apartment and heard him say he had done something "stupid" or "wrong" immediately before discovering her body. In addition, the jury heard other evidence, besides the victim's statements, which suggested the petitioner and the victim had an abusive relationship. Najiyah testified that petitioner pushed his way into the victim's—her mother's—apartment on at least two occasions prior to the day of the murder. On one of those occasions, Najiyah saw petitioner

---

[14] Recently, in *People v. Brooks*, 31 N.Y.3d 939, 942 (2018), the Court of Appeals rejected the reasoning employed in *Bierenbaum* in more direct terms by clarifying that even if "evidence that defendant...threatened to kill the victim is admissible under a *Molineux* theory, [it] must still be in admissible form." The court added, "[n]or is there any blanket hearsay exception providing for use of such statements as 'background' in domestic violence prosecutions." *Id.* However, mindful that this case had not yet been decided at the time of petitioner's trial in 2010, I limit my analysis to case law that was available then.

push her mother into a radiator so hard that she screamed in pain, and on another she was able to hear the petitioner and her mother arguing. *See* Tr. at 502–07. Cabrera also testified that she had seen bruises on the victim's face and that she saw petitioner banging on the victim's door and heard him yelling "open the f***ng door" outside of the victim's apartment on the day of the murder, suggesting that petitioner was angry at the victim just hours before the crime was committed. *See* Tr. at 647–49, 653–58. Accordingly, the Appellate Division's determination that any error harmless was not unreasonable, and petitioner's claim based on the admission of hearsay evidence of his prior bad acts should be denied.

### 2. Confrontation Clause

Petitioner's hearsay claim raises a second issue: whether the trial court's admission through third-party testimony of the victim's statements deprived petitioner of his Sixth Amendment Confrontation Clause right. As discussed above, whether admitting hearsay evidence of the victim's statements violated the petitioner's right of confrontation turns on whether the statements introduced at trial were testimonial. Statements to friends and family are generally non-testimonial. *See Burkett*, 2016 WL 6659492, at *13 n. 16 (concluding that statements were non-testimonial because "there [wa]s no indication that the declarant (i.e., the victim) had any reasonable expectation that her statements, made to friends and family outside the context of any proceeding, investigation, or formal complaint, would be used in future judicial proceedings"). Indeed, in a case arising in the domestic violence context, the Supreme Court has observed that "[s]tatements to friends and neighbors about abuse and intimidation…would be excluded, if at all, only by hearsay rules," and not the Sixth Amendment. *Giles v. California*, 554 U.S. 353, 376 (2008).

It is clear, then, that the testimony of Cabrera and Willis relating the victim's statements to them about petitioner's abuse were not admitted in violation of the Confrontation Clause, even if they may have been admitted in violation of New York's evidence rules. Petitioner's claims under the "Point Two" heading should therefore be denied in their entirety.

### D.  Ineffective Assistance of Trial Counsel

Under "Point Three," *see* Habeas Pet. at 31–35, petitioner argues that trial counsel provided him ineffective assistance by stumbling over words and failing to object to the testimony of petitioner's parole officer and of Willis, who had not seen the victim in two years. *Id.* at 32. Petitioner further argues that his attorney failed to preserve the following arguments for appellate review: that the missing witness would have given non-cumulative testimony, that the evidence was legally insufficient to support a second degree murder conviction, and that the victim's statements, as recounted through the testimony of two witnesses—likely Cabrera and Willis—did not fit within a recognized exception to the hearsay rule. *Id.* at 33–34. Because petitioner's ineffective assistance counsel claim was rejected on the merits by the Appellate Division, the state court's finding is entitled to AEDPA deference. This claim is also without merit.

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), sets forth the standard governing ineffective assistance of counsel under the Constitution. "[T]o prevail on an ineffective-assistance-of-counsel claim, a defendant must meet a two pronged test: (1) he 'must show that counsel's performance was . . .so deficient that, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance'" and "(2) he must show that 'the deficient performance prejudiced the defense.'"  *Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (quoting *Strickland*, 466 U.S.

at 687).  "It is the accused's 'heavy burden' to demonstrate a constitutional violation under *Strickland*."  *Moreno v. Smith*, 2010 WL 2975762, at \*15 (E.D.N.Y. July 26, 2010) (quoting *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004)).

Though the *Strickland* test has two prongs, courts need not consider the first "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice."  *Ortiz v. Rock*, 2016 WL 6068808, at \*8 (E.D.N.Y. Oct. 13, 2016) (quoting *Strickland*, 466 U.S. at 697).  Accordingly, where a petitioner's ineffective counsel claim "can be resolved with reference to *Strickland*'s prejudice prong alone," a Court may properly "assume, without deciding" that counsel's performance was deficient, or "fell below an objective standard of reasonableness."  *Waiters v. Lee*, 857 F.3d 466, 478 (2d Cir. 2017) (bypassing the first prong); *Basagoitia*, 2012 WL 4511358, at \*13.

Courts reviewing prejudice under *Strickland* must determine whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Waiters*, 857 F.3d at 479.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome, and thus the chance of an alternate result must be 'substantial' not just 'conceivable.'"  *Id.* at 480 (internal quotation marks and citations omitted).

Here, it is clear that counsel's errors, if any, did not affect the outcome of petitioner's trial.  First, as discussed above, counsel did seek a missing witness charge, but it was denied.  Tr. at 856:2-20, 858:12-20; 912:2-4.  Moreover, and also as discussed above, the decision not to give a missing witness charge was undoubtedly proper, and a more vigorous request would no doubt have been unsuccessful.

Though petitioner's trial counsel may have failed to preserve certain arguments concerning the admission of hearsay—and it does appear that trial counsel failed to object on hearsay grounds at a key moment, *see* Tr. at 509:4-8—these errors did not prejudice petitioner. Different hearsay rulings would not have prevented the jury from hearing about the Tippinses' encounter with petitioner on the stairwell or the testimony from others suggesting that petitioner and the victim's relationship was becoming increasingly violent. In fact, because these rulings—whether correct or not—were ultimately harmless, the Appellate Division did not even bother to address the prosecution's argument on appeal that petitioner's trial counsel failed to preserve arguments opposing the admission of the victim's hearsay. *See* Resp't's Appellate Br. at 46–49, Dkt. 10-1 at ECF page 42; *see also Bierenbaum v. Graham,* 607 F.3d 36, 57 (2d Cir. 2010) (noting that because the Appellate Division could have found petitioner's claim unpreserved, but still addressed the merits of the claim, petitioner "cannot claim that counsel was ineffective in failing to preserve the issue for appeal"). Regarding the testimony of Willis and the parole officer, petitioner's trial counsel did in fact raise these issues at trial, but petitioner was nevertheless found guilty. *See* 603:5-13, 919:22–920:1.[15]

For these reasons, petitioner's ineffective counsel claim should be denied.

*E. Sufficiency of Evidence*

Liberally construed, petitioner's reply raises as a final claim that the evidence at trial was insufficient to convict him of second-degree murder and fourth-degree criminal possession of a weapon. Pet.'s Reply at 12–15. This claim encompasses several distinct points. Petitioner first argues that a "review of the court records, police reports and laboratory results from the forensic

---

[15] In fact, defense counsel's attempt "to minimize damaging testimony by offering to stipulate to testimony about defendant's parole" is just one example of what was an overall effective performance. *See* Opp. at 36–38 (citing to trial transcript to show how petitioner's trial counsel provided effective representation).

department, shows no credible or physical evidence in this case to sustain a guilty verdict at trial." *Id.* at 12.  In connection with this claim, petitioner takes issue with the scientific evidence introduced at trial and questions why no DNA analysis of the victim's fingernails was conducted. *Id.* at 12–13.  The remainder of petitioner's claims dispute the persuasiveness of the People's case-in-chief, arguing that the circumstantial evidence was insufficient to support his conviction, and that two witnesses, Cabrera and Najiyah, lacked credibility.  *Id.* at 14–15.

Petitioner's sufficiency argument was not presented to the Appellate Division and is accordingly procedurally barred from habeas review.  *Aparicio*, 269 F.3d at 93.  I nevertheless review the claim and find it to be without merit.

Petitioner's final argument, again liberally construed, challenges both the legal sufficiency of the evidence used to convict him as well as the weight given to the evidence presented at trial.  "It is well settled that a 'weight of the evidence' claim is distinct from a 'sufficiency of the evidence' claim and is a state claim based on New York Criminal Procedure Law § 470.15(5) that is not reviewable in [a] federal habeas proceeding."  *Blake v. Martuscello*, 2013 WL 3456958, at *9 (E.D.N.Y. July 8, 2013) (collecting cases).  In contrast, "legal sufficiency of evidence" claims are cognizable in federal habeas proceedings, though a petitioner making such a claim "bears a very heavy burden."  *Einaugler v. Supreme Court of St. of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997).

Under the Due Process Clause of the Fourteenth Amendment, "a state prisoner 'is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'"  *Id.* at 839 (quoting *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)).  When analyzing a sufficiency of the evidence claim, "a court may neither disturb the jury's findings with respect to the witnesses' credibility,

nor make credibility judgments about the testimony presented at petitioner's trial or…weigh conflicting testimony." *Brown v. Lord*, 2003 WL 22670886, at *4 (E.D.N.Y. Oct. 20, 2003) (internal quotation marks and citation omitted). "Rather, when faced with a record of historical facts that supports conflicting inferences, this Court must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Peart v. Royce*, 2019 WL 3454076, at *6 (N.D.N.Y. July 31, 2019) (internal quotation marks omitted). Thus, the court's limited role in reviewing legal sufficiency claims "is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction." *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 330 (1995)).

Here, the evidence introduced at trial, detailed above, was plainly sufficient to sustain petitioner's conviction: Cabrera saw petitioner cursing and banging on the victim's door, Najiyah saw him push his way into the apartment on multiple occasions including the night in question, the victim's downstairs neighbor heard a women yell "a man is killing me," and the Tippinses saw petitioner leaving the victim's apartment seconds before the body was discovered—in an exchange caught by video surveillance cameras. Tr. at 498–502, 542–45, 549–53, 573–77, 620–22, 647–48. Accordingly, the record was not "so totally devoid of evidentiary support that a due process issue is raised." *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994).

Petitioner's specific argument that Cabrera and Najiyah lacked credibility is not properly before this Court; "the task of assessing witness credibility rests solely with the jury, and the jury is free to believe part and disbelieve part of any witness's testimony." *Foster v. Warden, Five Points Corr. Facility*, 2019 WL 4918102, at *13 (E.D.N.Y. Sept. 30, 2019) (internal quotation marks omitted). Likewise, the jury was free to credit or discredit the medical examiners'

testimony concerning the analysis of DNA at the crime scene.  Petitioner's counsel attempted to undermine the medical examiners' testimony at trial by making the same argument petitioner now makes: that the police should have conducted an analysis of the DNA underneath the victim's fingernails, *see* Tr. at 892, 917, but there is no indication this persuaded the jury, or that the prosecution's case was lacking without this DNA evidence.

Petitioner's complaint that the prosecution's case relied on circumstantial evidence is likewise meritless.  "It is well settled that crimes 'may be proven entirely by circumstantial evidence.'"  *Hudson v. Perez*, 2013 WL 5229797, at *10 (S.D.N.Y. Sept. 17, 2013) (quoting *United States v. Suref*, 15 F.3d 225, 228 (2d Cir. 1994)).  Here, the sequence of events provided overwhelming circumstantial evidence tying petitioner to the victim's murder.  Accordingly, petitioner's sufficiency claim should be rejected.

## CONCLUSION

For all the reasons stated above, I respectfully recommend that Johnson's petition for a writ of habeas corpus be denied in its entirety.  Typically, any objections to the recommendations made in this Report would have to be made within fourteen days after service of the Report; in light of petitioner's *pro se* status and that service of this Report will be effected by mailing, however, that time is extended such that any objections shall be filed no later than December 23, 2020.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. Proc. 72(b)(2).  Failure to file timely objections may waive the right to appeal the District Court's order.    *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (discussing waiver under the former ten day limit).

/s/
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
November 25, 2020
*U \#ECC 2019-2020\13-cr-4337 Johnson v. Griffin\13-Civ-4337 Johnson v. Griffin R&R FINAL.docx*