UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------

ERIK JOHNSON,

                       Petitioner,              **MEMORANDUM & ORDER**
                                                    13-CV-4337 (MKB) (SMG)

         v.

PATRICK GRIFFIN,

                       Respondent.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Petitioner Erik Johnson, proceeding pro se and currently incarcerated at Sullivan

Correctional Facility in Fallsburg, New York, filed the above-captioned petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2554 on July 25, 2013, alleging that he is being held in

state custody in violation of his federal constitutional rights.  (Pet. for Writ of Habeas Corpus

("Pet.") 1, Docket Entry No. 1.)[1]  Petitioner's claims arise from a judgment of conviction

following a jury trial in the Supreme Court of New York State, Queens County (the "Trial

Court"), on charges of murder in the second degree and criminal possession of a weapon in the

fourth degree.  (*Id.* at 1; Tr. of Sentencing Proceedings before the Hon. Gregory Lasak dated

Mar. 25, 2010 ("Sentencing Tr.") 20:12–20, annexed to State Ct. R. as Ex. 8, Docket Entry No.

10-8, at 106–26.)  Petitioner challenges his conviction on the grounds that: (1) he was denied the

right to a fair trial because the prosecution did not call Thomas Livingston as a witness and the

Trial Court did not give a missing witness charge; (2) he was denied the right to confront

witnesses for the same reason; (3) he was denied the right to a fair trial because the Trial Court

---

[1]  Because the petition is not consecutively paginated, the Court refers to the page
numbers assigned by the electronic case filing system.

admitted hearsay testimony recounting statements describing his prior bad acts; and (4) he was denied the right to the effective assistance of trial counsel.  (Pet. 20–21, 23, 26, 31.)  In his reply, he also argues that (5) the evidence presented at trial was insufficient to support his conviction.  (Pet'r's Traverse & Mem. of Law ("Pet'r's Reply") 12, 14–15, Docket Entry No. 12.)

On April 30, 2020, the Court referred the petition to Magistrate Judge Steven M. Gold for a report and recommendation, (Order dated Apr. 30, 2020), and, on November 25, 2020, Judge Gold recommended that the Court deny the petition in its entirety (the "R&R"), (R&R 40, Docket Entry No. 14).  On April 22, 2021, Petitioner timely filed objections to the R&R.[2]  (Pet'r's Objs. ("Objs."), Docket Entry No. 16.)  For the reasons set forth below, the Court adopts the R&R in its entirety and denies the petition for a writ of habeas corpus.

---

[2]  Because it appeared from the docket that Petitioner had never been mailed a copy of the R&R, the Court mailed the R&R to Petitioner and extended the deadline to file objections until February 18, 2021.  (Order dated Jan. 19, 2021.)  Petitioner then requested an extension until April because he did not have access to the law library due to COVID-19.  (Pl.'s Letter dated Feb. 25, 2021, Docket Entry No. 15.)  The Court granted Petitioner's request and directed him to file his objections by April 30, 2021.  (Scheduling Order dated Feb. 25, 2021.)  Petitioner gave his objections to prison officials for forwarding to the Court on April 22, 2021, making them timely.  (Objs. 9); *see, e.g.*, *Silver v. Dalessandro*, No. 15-CV-3462, 2019 WL 5902645, at *4 n.4 (E.D.N.Y. Oct. 28, 2019) ("Court papers from incarcerated, *pro se* litigants are deemed to have been filed when those documents are placed in the possession of prison officials for forwarding to the court." (first citing *Houston v. Lack*, 487 U.S. 266, 275–76 (1988); and then citing *Harrison v. Harlem Hosp.*, 364 F. App'x 686, 687 (2d Cir. 2010))), *report and recommendation adopted sub nom. Silver v. Salessandro*, 2019 WL 5895469 (E.D.N.Y. Nov. 12, 2019).

## I.   Background

### a.   Factual background

Petitioner's ex-girlfriend, Asma Johnson (the "Victim"),[3] was found stabbed to death in

her apartment on November 8, 2006.  (Aff. of Ellen Abbot ("Abbot Aff.") ¶ 4, Docket Entry No.

8.)  Police arrested Petitioner at his mother's home in Pennsylvania two weeks later.  (*Id.*)

Petitioner was charged with murder in the second degree, N.Y. Penal Law § 125.25(1), and

criminal possession of a weapon in the fourth degree, *id.* § 265.01(2).  (*Id.* ¶ 5.)

#### i.   The trial

Petitioner's jury trial commenced on January 27, 2010, in the Trial Court before Judge

Gregory Lasak.  (State Trial Tr. ("Tr.") 1, Docket Entry Nos. 10-2 to 10-8.)

##### 1.   Evidence at trial

###### A.   Petitioner's relationship with the Victim

Petitioner began dating the Victim in the late summer or early fall of 2006.  (Tr. 502:4–7,

539:11–540:4, 645:17–21, 676:23–677:6.)  By late October, their relationship had deteriorated,

and the Victim had instructed her daughter, Najiyah Livingston, who was seven years old at the

time, not to let Petitioner into her apartment.  (*See* Tr. 497:6–7, 502:8–505:15.)  Najiyah testified

that Petitioner waited outside of the apartment and pushed his way in once she opened the door

on two occasions in late October.  (Tr. 502:11–506:1.)  On one of those occasions, Petitioner

pushed the Victim, causing her to fall and bruise her legs, thigh, and head, and on the other

occasion, Najiyah heard Petitioner and the Victim arguing.  (Tr. 502:18–504:15, 505:22–507:4,

---

[3] Though the Victim, Asma Johnson, shares the same last name as Petitioner, Erik Johnson, they are not related.  (*See* Tr. 348:19–21.)  To avoid confusion, and for consistency with the R&R, the Court refers to Ms. Johnson as the "Victim" and to Mr. Johnson as "Petitioner."  (R&R 2 n.3.)

514:3–9.)  The Victim's friend, Angela Willis, testified that the Victim told her in late October

that Petitioner had "hit her, beat her," but that the Victim did not want to report this to the police

"because he was on parole."  (Tr. 677:7–678:8.)  The Victim's friend and neighbor who lived

across the hall, Yahaira Cabrera, testified that she saw the Victim throwing out the trash a week

before her murder and noticed bruises on her face, which the Victim told her had come from

Petitioner hitting her.  (Tr. 657:14–658:10.)  That same week, Cabrera saw Petitioner "banging"

on the Victim's door, which she had seen him do "several times" before.  (Tr. 658:16–659:2.)

On two of these previous occasions, she had "called the cops," who went to the Victim's door,

but the Victim "wouldn't open the door."  (Tr. 659:2–659:15.)  Another neighbor, Brenda

Jordan, testified that she saw Petitioner "either . . . sitting on the stairs or standing next to [the

Victim's] door, or knocking on the door, calling her" and the Victim "not answering"

approximately twenty times in the weeks leading up to the Victim's murder.  (Tr. 764:1–24.)

### B.  Day of the murder

On the day of the murder, Cabrera saw Petitioner banging on the Victim's door between

2:00 PM and 3:00 PM and heard him yell "open the f***ing door."  (Tr. 647:16–648:24.)  Jordan

saw Petitioner standing at the Victim's door between 2:45 PM and 3:45 PM.  (Tr. 762:20–763:7.)

After Petitioner went down the stairs, Cabrera and the Victim spoke.  (Tr. 648:25–649:17.)  The

Victim told Cabrera "that she was scared and that she was trying to leave [Petitioner], but he

threatened her," telling her that "if she calls the cops on him or decides to do anything against

him, that he would not only hurt her son" but also "come back and kill her."  (Tr. 656:3–24.)

At about 5:45 PM, the Victim told Najiyah and her brother, Khalil, to go downstairs,

where their father, Thomas Livingston, was waiting to drive them to Najiyah's school to play

math games.  (Tr. 347:12–16, 497:8–9; 497:24–499:5.)  When Najiyah opened the apartment

4

door, she heard footsteps and saw Petitioner, who pushed her and ran into the apartment.  (Tr. 499:13–500:13.)  Najiyah asked the Victim if she was going to be okay and the Victim said yes and told the children to go downstairs.  (Tr. 501:13–19.)  The children left with Livingston for Najiyah's school, leaving the Victim alone in the apartment with Petitioner.  (Tr. 501:21–502:3.)

Later, while Livingston was driving the children back to the Victim's apartment, he spoke on the phone to the Victim, who told him not to bring the children home.  (Tr. 508:3–17, 526:16–18.)  Livingston asked Najiyah who was at the apartment with the Victim when they left earlier, and Najiyah responded that Petitioner was at the apartment.  (Tr. 508:3–17.)  Livingston then brought the children to the house of Petitioner's aunt, Gloria Tippins ("Gloria Tippins"). (Tr. 352:12–15, 508:15–22.)

Livingston and the children arrived at Gloria Tippins's house at around 8:10 PM.  (Tr. 540:24–541:10.)  Livingston told Gloria Tippins and her daughter, Petitioner's cousin Shauna Tippins ("Shauna Tippins"), that Petitioner and the Victim were arguing and Petitioner was "causing all types of problems, and that [they] should make him leave."  (Tr. 509:4–8, 541:14– 541:22.)  Shauna Tippins and Gloria Tippins testified that they walked to the Victim's apartment building, which was two buildings from their own.  (Tr. 542:9–25, 573:12–574:13.)  Shauna Tippins and Gloria Tippins entered the Victim's building and walked through a foyer to the stairs to go to the Victim's apartment on the second floor.  (Tr. 574:14–575:4.)  As they ascended the stairs, they saw Petitioner coming down from the second floor.  (Tr. 543:5–544:3, 575:5–10.)  As Petitioner passed them on the stairs, he told them he had done something "wrong" or "stupid" and pointed up, then left the building.  (Tr. 544:24–545:7, 575:23–576:7.)  Shauna Tippins and Gloria Tippins proceeded up the stairs to the Victim's apartment, where they found the door ajar and discovered the Victim's body lying in a pool of blood.  (Tr. 545:8–21, 576:12–577:7.)

5

Shauna Tippins and Gloria Tippins ran back downstairs to get help.  (Tr. 545:25–546:2, 577:3–11.)  Gloria Tippins was saying "Oh, my God," "oh, my God," and her friend, Glenn Burgess, who lived on the first floor of the Victim's apartment building, heard her and came out into the hall to ask what the problem was.  (Tr. 577:17–578:6, 605:21–608:13.)  Gloria Tippins told Burgess what had happened and Burgess went upstairs with her to the Victim's apartment, then ran back downstairs to get his phone and call 911.  (Tr. 577:17–578:1, 608:8–610:9.)  Meanwhile, Shauna Tippins ran outside, saw Petitioner walking away from the building, and asked, "[W]hat did you do?"  (Tr. 546:5–15, 577:14–15.)  Petitioner "didn't say anything, he just looked back."  (Tr. 546:17.)  Surveillance cameras captured video recordings of Livingston going to Gloria Tippins's apartment with the children, Gloria Tippins and Shauna Tippins' encounter with Petitioner on the stairs, and Burgess coming out of his apartment, checking the Victim's apartment, and running back downstairs to get his phone.  (*See* Tr. 549:13–553:8, 579:11–586:4, 611:20–613:10.)

Burgess testified that he heard Gloria Tippins's voice in the hall and called the police at around 8:21 PM.  (Tr. 577:17–21, 606:12–607:24, 610:4–9, 614:3–6.)  Burgess's sister, Luxzoria Hope, lived with Burgess and testified that she had heard a female voice coming through the pipes above her kitchen saying "[h]elp me, help me, this man is killing me" a couple minutes after 8:00 PM.  (Tr. 620:18–622:12, 630:11–631:20, 633:7–11.)

Police arrived at the Victim's apartment at approximately 8:30 PM.  (Tr. 391:19–393:6.)  Several minutes later, a paramedic arrived, however the Victim "was in cardiac arrest" and "there was no hope of resuscitation."  (Tr. 372:14–373:9, 375:3–19.)  The Victim had been stabbed twice in her neck, with one stab cutting her carotid artery "completely" in half and chipping her second vertebra and the other penetrating her jugular vein, and twice in her

6

abdomen, with one stab penetrating her liver and the other perforating her small intestine.  (Tr. 375:20–375:24, 866:11–13, 867:23–873:6; 879:21–24.)  In addition, she had a number of injuries to the front and sides of her face that suggested she had been subjected to blunt force traumas, including a scrape and a bruise on her upper lip, a three-quarter-inch "laceration or tearing of the upper lip where it connects to the teeth," a "large bruise" with a scrape over it and swelling on the right side of her face, and a bruised left ear that was lacerated where it attaches to the side of the face.  (Tr. 874:8–876:22.)  There was also "a series of bruises" on her arms and legs and a bruise on her left wrist, which were "consistent with being grabbed with a great degree of force." (Tr. 876:23–878:19.)  Detectives recovered a knife with a broken tip from inside the Victim's garbage pail and later matched the DNA on the knife to the Victim's DNA, though Petitioner's DNA was not found on the knife's handle.  (Tr. 425:22–23, 463:1–20, 829:18–830:17, 843:25– 844:6.)  Medical examiner Susan Horan testified that she matched traces of semen on an anal swab taken from the Victim to Petitioner's paternal line.  (Tr. 832:3–11, 845:3–14.)

### C.   Petitioner's arrest

Petitioner was arrested at his mother's home in Pennsylvania on November 20, 2006, about two weeks after the murder.  (Tr. 690:23–693:25.)  When the police arrived, they found Petitioner hiding under a sofa bed.  (Tr. 739:10–741:3.)  After the police took him to the police station, Petitioner waived his *Miranda* rights.  (Tr. 694:6–698:16.)  Petitioner told the police that he had been in Pennsylvania since before October 31, 2006, and that he had "paid a crack head $40 to bring him."  (Tr. 701:19–702:9.)  When the police asked him why he did not see his parole officer, Roger Chung ("PO Chung"), on November 15, 2006, Petitioner "had no answer." (Tr. 702:24–703:2, 770:9–10.)  The police asked Petitioner if he sees PO Chung every two weeks and if he had seen PO Chung prior to November 15, 2006, and Petitioner responded "yes" to

both questions.  (Tr. 703:8–15.)  When asked how he could have seen PO Chung two weeks

prior to November 15, 2006, which would have been on November 1, 2006, when he said that he

was not in New York in November, Petitioner stated "I told you a crack head drove me to

Pennsylvania before Halloween."  (Tr. 704:7–13.)  Petitioner then claimed that he had gone back

to New York on November 1, 2006, "and then the crack head drove me back [to Pennsylvania]

for $40."  (Tr. 704:15–22.)  PO Chung testified that he had seen Petitioner in New York on

November 1, 2006, but that Petitioner did not attend parole meetings on November 9 and 15,

2006.  (Tr. 774:12–776:11.)

### D.   Defense counsel's summation

Defense counsel did not call any witnesses.  He elicited several facts on cross-

examination of the prosecution's witnesses and emphasized them in his summation.  First, he

highlighted the fact that Petitioner's alleged abuse had never been reported to the police or PO

Chung.  Najiyah testified that the police never came to the Victim's apartment when she and

Petitioner were arguing, that she did not know whether the Victim ever reported their arguments

to the police, and that she never told anyone about the time Petitioner had pushed the Victim,

giving her bruises.  (Tr. 520:25–522:1.)  Cabrera testified that although she had called the police

when Petitioner was banging on the Victim's door late at night and told the Victim "if he's doing

this to you [then] you need to call the police," she personally had never spoken to any police

officers about allegations of abuse, and the Victim "never opened the door when the police

would knock."  (Tr. 669:4–671:12.)

Second, he elicited that neither Shauna Tippins nor Gloria Tippins had noticed blood on

Petitioner when they encountered him at the Victim's apartment, even though the wounds to her

carotid artery and jugular vein would have caused her to "bleed profusely" and blood could have

"spew[ed] out from the neck."  (Tr. 564:1–565:10, 598:1–599:1, 893:8–894:12.)  He also elicited that the police did not observe blood on the stairs of the Victim's apartment building or any trail of blood in her apartment.  (Tr. 712:11–25.)

In addition to emphasizing these points in his summation, (Tr. 924:22–925:5, 935:13–936:6 (no reported abuse); Tr. 910:19–22, 928:10–929:7 (blood)), he argued that the evidence was insufficient to convict Petitioner because it was circumstantial and "[t]here were no eyewitnesses who saw [him] kill [the Victim]."  (Tr. 908:7–12, 916:19–22, 943:3–5.)  He also emphasized that neither Petitioner's fingerprints nor his DNA were found on the knife and that the medical examiners failed to analyze the DNA under the Victim's fingernails.  (Tr. 804:22–805:2, 843:22–844:6, 892:3–24, 916:23–917:16.)

Finally, he attempted to place Livingston "under suspicion by revealing that the [V]ictim had acquired a protective order against Livingston in 2002 and suggesting that Livingston was conspiring with his daughter, Najiyah, to blame [P]etitioner for the [V]ictim's death, which Livingston may have in fact committed; the [Trial] Court, however, precluded much of this line of inquiry."  (R&R 7; *see also* Tr. 362:11–363:16, 518:7–25, 528:22– 529:24, 719:9–722:8, 923:1–9.)

## 2.   Verdict and sentencing

On February 11, 2010, the jury returned a verdict of guilty on both counts.  (Tr. 981, 1023:7–19.)  On March 25, 2010, the Trial Court sentenced Petitioner to twenty-five years to life for murder in the second degree and one year for criminal possession of a weapon in the fourth degree.  (Sentencing Tr. 1, 16:19–20:20.)

###### ii.   Direct appeal

Petitioner timely appealed his conviction to the Appellate Division, Second Department, arguing that (1) his Fourteenth Amendment right to a fair trial was denied when the court refused to give a missing witness charge concerning Livingston and (2) his rights to cross-examination and a fair trial under the Sixth and Fourteenth Amendments and the New York State Constitution were denied when the court improperly allowed the prosecution to introduce hearsay testimony that he abused and threatened to kill the Victim and that he was in the Victim's apartment shortly before her body was discovered.  (Appellate Br. 16, 26, Docket Entry 10-1, at 1–41.)  Petitioner also suggested in footnotes that his trial counsel was ineffective under state and federal standards.  (*Id.* at 25 n.6, 37 n.9.)

On May 23, 2012, the Appellate Division affirmed Petitioner's conviction, concluding that "[e]ven if the Supreme Court erred in denying [his] request for a missing witness charge" or in "admitting certain hearsay testimony of third parties," any error was harmless, "as there was overwhelming evidence of [his] guilt and no significant probability that the error contributed to his conviction."  *People v. Johnson*, 943 N.Y.S.2d 910, 911 (App. Div. 2012) (quoting *People v. Smalls*, 916 N.Y.S.2d 795, 795 (App. Div. 2011)).  The court also found that Petitioner's "remaining contention [was] without merit," apparently referring to his ineffective assistance of counsel claims.  *Id.*

On August 9, 2012, the Court of Appeals denied Petitioner leave to appeal.  *See People v. Johnson*, 19 N.Y.3d 997, 997 (2012); (Denial of Leave to Appeal, annexed to State Ct. R. as Ex. 1, Docket Entry No. 10-1, at 125).

10

**b.    Report and recommendation**

**i.    Claims based on refusal to give a missing witness charge**

Because "Petitioner's argument concerning the trial court's failure to give a missing

witness charge implicates the Fourteenth Amendment right to a fair trial and the Sixth

Amendment right of confrontation," Judge Gold considered these as separate claims.  (R&R 23.)

**1.    Denial of Fourteenth Amendment right to fair trial**

Judge Gold found that Petitioner exhausted his claim "that he was denied a fair trial due

to the trial court's refusal to give a missing witness charge," (*id.* at 18), and that "[b]ecause the

Appellate Division's dismissal of this claim as 'harmless' was based on the merits," it is entitled

to deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), (*id.*

at 24).  Judge Gold found that the Trial Court's discretionary decision not to give a missing

witness charge did not deny Petitioner the right to a fair trial.  (*Id.* at 24.)  Judge Gold noted that

there is no clearly established Supreme Court precedent requiring a trial court to instruct the jury

with respect to a missing witness, and that the propriety of a state court's jury instruction is a

matter of state law that does not raise a federal question.  (*Id.*)  He therefore found that

Petitioner's claim only warrants habeas relief if the Trial Court's decision so infected the entire

trial that the resulting conviction violates due process.  (*Id.* at 25.)  Judge Gold concluded that the

Trial Court's decision "was not error under state or federal law, much less error that infected the

fairness of the trial," because "Livingston was available to be called by either the prosecution or

[the] defense, and it was only for tactical reasons that defense counsel declined to call him."

(*Id.*)  Judge Gold further found that even if the Trial Court erred, this error did not deprive

Petitioner of due process because the Appellate Division reasonably concluded that "there was

overwhelming evidence of [Petitioner's] guilt and no significant probability that the error

contributed to his conviction."  (*Id.* at 26 (quoting *Johnson*, 943 N.Y.S.2d at 911).)  Finally,

11

Judge Gold noted that "even if there had been prejudice, it would have been mitigated by defense counsel's arguments in summation." (*Id.*)

### 2.   Denial of Sixth Amendment right to confront witness

Judge Gold found that Petitioner failed to exhaust his claim that the Trial Court's refusal to give a missing witness charge violated the Sixth Amendment's Confrontation Clause because he did not raise it before the Appellate Division. (R&R 20, 22, 27.) While Petitioner's appellate brief "arguably hint[ed] at the Confrontation Clause issue" by characterizing Livingston's statements to Najiyah in the car about Petitioner's presence in the Victim's apartment on the day of the murder as "an accusation by [Livingston] a non-testifying witness" and citing to *People v. Barboza*, 805 N.Y.S.2d 657 (App. Div. 2005), Judge Gold concluded that "this fleeting reference did not provide the state court with a 'fair and meaningful' opportunity to consider any federal Confrontation Clause claim." (*Id.* at 20–21 (second alteration in original) (quoting Pet'r's App. Br. 33–34, Docket Entry No. 10-1, at 42).) In addition, Judge Gold found that Petitioner "offer[ed] no grounds that might excuse his procedural default," for although Petitioner "raises an ineffective assistance of counsel claim, which may excuse procedural default if it 'causes' the default, [he] does not present his ineffective counsel claim as the cause of his procedural default," and "[e]ven if he had, it would not change the outcome," as he "was not denied effective assistance of counsel" and because he "claims that only his trial counsel provided ineffective assistance, though his appellate counsel is at least in part responsible for the decision not to raise the Confrontation Clause issue in the appellate brief." (*Id.* at 22 & n.9.)

Although Judge Gold found that Petitioner failed to exhaust this claim, he nevertheless considered it on its merits and concluded that "[t]he statements that were introduced at trial . . . were *not* testimonial and their admission therefore did not violate [P]etitioner's Confrontation

Clause rights."[4]  (*Id.* at 28.)  He noted that "Livingston's statement to his daughter as he drove her home was initially nothing more than a logistical conversation concerning where to bring her and her brother," and that "[t]he sequence of events further demonstrates that [his] statements that . . . [P]etitioner was causing 'problems' and was arguing with the [V]ictim were made to elicit the Tippinses' help and to explain why [they] should check on the [V]ictim and [P]etitioner."  (*Id.* at 28–29.)  Further, Judge Gold found it "likely that Livingston felt there was an ongoing emergency after speaking to the [V]ictim, and that his statements at the Tippinses' apartment were made for the 'primary purpose' of addressing that emergency as it was happening."  (*Id.* at 29.)  Even if Petitioner's right of confrontation was violated, Judge Gold concluded that such a violation would be harmless error, as Livingston's statements are unlikely to have influenced the jury's verdict given "the overwhelming evidence" against Petitioner, which "established not only that [he] and the [V]ictim had an abusive relationship but also that [he] admitted doing something 'wrong' or 'stupid' as he was seen leaving the [V]ictim's apartment just before her body was discovered, in an exchange captured by video surveillance footage."  (*Id.*)  Therefore, he concluded that "the Appellate Division's rejection of [P]etitioner's missing witness charge claim was neither contrary to, nor based on an unreasonable application of, clearly established federal law."  (*Id.* at 30.)

---

[4]  Judge Gold also found that Petitioner's "attempt to supplement the record by attaching exhibits to his habeas petition," including grand jury minutes, a copy of the statement Livingston made at the police station, and pretrial hearing minutes, "is prohibited under *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)" because these exhibits were not included in the state record.  (R&R 22; *see* Attachments to Pet., Docket Entry No. 1, at 36–188.)  Although statements Livingston made to the grand jury "are clearly testimonial," Judge Gold concluded that because they "were not introduced at trial" they "are not the basis of [P]etitioner's claim."  (R&R 28.)

### ii.   Claims based on improper admission of hearsay

In view of Petitioner's pro se status and because he brings his claim that the Trial Court improperly admitted hearsay concerning the Victim's statements to others about his prior bad acts under both the Sixth and Fourteenth Amendments, Judge Gold interpreted Petitioner's hearsay argument as encompassing both a claim that he was denied his Fourteenth Amendment right to a fair trial and "a separate claim that the state court's evidentiary rulings violated his rights under the Confrontation Clause."  (*Id.*)

### 1.   Denial of Fourteenth Amendment right to fair trial

Judge Gold found that Petitioner exhausted his claim that he was denied a fair trial based on the Trial Court's "decision to admit hearsay testimony regarding [his] prior misconduct."  (*Id.* at 18.)  "[B]ecause the Appellate Division deemed the [T]rial [C]ourt's admission of 'certain hearsay testimony of third parties' harmless," Judge Gold found that "the state court's ruling is entitled to AEDPA deference."  (*Id.* at 30.)  Judge Gold also found that "the testimony concerning [Petitioner's] prior misconduct, including that he had aggressively pushed his way into the [V]ictim's apartment, pushed her so hard she bruised her leg, and hit her, was properly admitted under [*People v. Molineux*, 168 N.Y. 264, 293 (1901)] to show 'that this defendant was motivated and had an intent to harm *this* victim,' and not merely that [P]etitioner had a general propensity for violence."[5]  (*Id.* at 32 (citations omitted) (quoting *People v. Bierenbaum*, 748 N.Y.S.2d 563, 587 (App. Div. 2002)).)  However, he concluded that the Trial Court "may have erred in . . . admitting the [V]ictim's statements through Cabrera's and Willis's hearsay testimony" under the prosecution's purported "background exception" to the hearsay rule, which

---

[5]   Judge Gold noted that "[t]he trial judge instructed the jury accordingly, explaining that the prior offenses 'must not be considered for the purpose of proving that the defendant had a propensity or predisposition to commit the crime' but only considered 'on the question of intent, motive or identity of the perpetrator.'"  (R&R 32 n.12.)

some New York courts have rejected.  (*Id.* at 32–33.)  Nevertheless, Judge Gold found that federal habeas corpus relief does not lie for errors of state law, and this error did not deprive Petitioner of due process because the Victim's statements "did not provide the 'basis for conviction or . . . remove a reasonable doubt that would have existed on the record without' them."  (*Id.* at 33 (first quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); and then quoting *Cox v. Bradt*, No. 10-CV-9175, 2012 WL 2282508, at *15 (S.D.N.Y. June 15, 2012)).)  Because "the jury heard other evidence, besides the [V]ictim's statements, which suggested [Petitioner] and the [V]ictim had an abusive relationship," Judge Gold concluded that "the Appellate Division's determination that any error [was] harmless was not unreasonable."  (*Id.* at 33–34.)

## 2.   Denial of Sixth Amendment right to confront witness

Judge Gold found that because "[s]tatements to friends and family are generally non-testimonial," "the testimony of Cabrera and Willis relating the [V]ictim's statements to them about [P]etitioner's abuse were not admitted in violation of the Confrontation Clause, even if they may have been admitted in violation of New York's evidence rules."  (*Id.* at 34–35 (citing *Giles v. California*, 554 U.S. 353, 376 (2008)).)

### iii.   Ineffective assistance of trial counsel claim

Judge Gold found that Petitioner exhausted his claim "that he was denied the effective assistance of trial counsel."[6]  (*Id.* at 18.)  Judge Gold found that "the state court's finding is

---

[6] Petitioner raises several ineffective assistance of counsel arguments in his petition that he did not raise in his appellate brief — namely, that trial counsel stumbled over words, failed to object to the testimony of PO Chung and Willis, and failed to preserve for appellate review the arguments that Livingston would have given non-cumulative testimony, that the evidence was insufficient to support a second degree murder conviction, and that the Victim's statements, as recounted through the testimony of Willis and Cabrera, did not fit within a recognized exception to the hearsay rule.  (Pet. 32–34.)  Although Petitioner did not raise these arguments in his appellate brief, Judge Gold found that they supplement but do not fundamentally alter the ineffective assistance of counsel claim Petitioner presented to the Appellate Division, and thus these arguments "are properly exhausted and reviewable."  (R&R 19.)

entitled to AEDPA deference" because the Appellate Division rejected Petitioner's claim.  (*Id.* at 35.)  Judge Gold concluded that "it is clear that counsel's errors, if any, did not affect the outcome of [P]etitioner's trial," as trial counsel "did seek a missing witness charge, but it was denied," and although trial counsel "may have failed to preserve certain arguments concerning the admission of hearsay . . . these errors did not prejudice [P]etitioner," as the jury still would have heard "about the Tippinses' encounter with [P]etitioner on the stairwell [and] the testimony from others suggesting that [his] and the [V]ictim's relationship was becoming increasingly violent."  (*Id.* at 36–37 (citation omitted).)   In addition, Judge Gold noted that "[r]egarding the testimony of Willis and the parole officer, [P]etitioner's trial counsel did in fact raise these issues at trial, but [P]etitioner was nevertheless found guilty."  (*Id.* at 37.)

### iv.   Sufficiency and weight of evidence claims

Judge Gold noted that Petitioner "challenges both the legal sufficiency of the evidence used to convict him [and] the weight given to the evidence," which are distinct claims.  (*Id.* at 38.)  Judge Gold found that Petitioner failed to exhaust these claims, which he first raised in his reply, (Pet'r's Reply 12–15), because he did not raise them before the Appellate Division, (R&R 38).  Judge Gold nevertheless considered these claims on the merits and concluded that Petitioner's weight of the evidence claim is a state claim that is not reviewable in a federal habeas proceeding, (R&R 38 (citing *Blake v. Martuscello*, No. 10-CV-2570, 2013 WL 3456958, at *9 (E.D.N.Y. July 8, 2013) (collecting cases))), and that Petitioner's sufficiency claim is meritless because "the evidence introduced at trial . . . was plainly sufficient to sustain [his] conviction," (*id.* at 39).

### c.   Petitioner's objections to the R&R

#### i.   Claims based on failure to give a missing witness charge

Petitioner objects to Judge Gold's finding that he failed to exhaust his claim that the Trial Court's refusal to give a missing witness charge violated the Sixth Amendment's Confrontation Clause by failing to raise it in his appellate brief except through a fleeting reference to *People v. Barboza*.  (Objs. 4–5.)  In support, Petitioner argues that the default should be excused because Judge Gold recognized that Petitioner's trial counsel was ineffective when he noted that "[P]etitioner claims that only his trial counsel provided ineffective assistance, though his appellate counsel is at least in part responsible for the decision not to raise the [C]onfrontation [C]lause issue in the appellate brief."  (*Id.* at 6 (quoting R&R 22 n.9); *see also id.* at 4–5 (arguing that even if his appellate brief referenced *People v. Barboza* "without mentioning any United States Supreme Court precedents," it "clearly supports [his] ineffective assistance [of counsel] claim," which is "corroborate[d]" by Judge Gold's footnote).)[7]

Petitioner also objects to Judge Gold's recitation of the fact that, in opposing defense counsel's request for a missing witness charge, the prosecution "argued that all references to facts involving . . . Livingston in its opening statement were covered by his daughter Najiyah Livingston" and that "any piece of circumstantial evidence that [Livingston] may have was already testified to by [Najiyah] who . . . is a better witness.'"  (Objs. 3; *see* R&R 13.)  In support, Petitioner argues that New York Criminal Procedure Law section 60.20 prohibits the

---

[7]  Judge Gold's footnote stated: "[h]ere, as explained below, [P]etitioner was not denied effective assistance of counsel under federal standards.  In addition, [P]etitioner claims that only his trial counsel provided ineffective assistance, though his appellate counsel is at least in part responsible for the decision not to raise the Confrontation Clause issue in the appellate brief." (R&R 22 n.9.)

testimony of children under age twelve from being admitted.[8]  (Objs. 3.)  The Court liberally construes this argument as an objection to Judge Gold's finding that the Trial Court's refusal to give a missing witness charge did not violate Petitioner's constitutional rights.

### ii.   Claims based on improper admission of hearsay

Petitioner requests that the Court treat his Memorandum of Law and Traverse "as an objection to [the R&R] regarding the hearsay testimon[y] from Ms. Cabrera and Ms. Willis." (*Id.* at 6.)

### iii.   Ineffective assistance of trial counsel and sufficiency of the evidence claims

As noted above, Petitioner argues that the default of his Confrontation Clause claim based on the Trial Court's refusal to give a missing witness charge should be excused because the failure of his appellate brief to mention the Confrontation Clause was caused by the ineffective assistance of his trial and appellate counsel.  (Objs. 4–5.)  The Court liberally construes this as an objection to Judge Gold's finding that trial counsel did not provide ineffective assistance.[9]

## II.   Discussion

### a.   Standards of review

#### i.   Report and recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."

---

[8]  Najiyah was ten years old when she testified.  (Tr. 496:10–11.)  New York Criminal Procedure Law section 60.20 provides that "[e]very witness more than nine years old may testify only under oath unless the court is satisfied that such witness cannot, as a result of mental disease or defect, understand the nature of an oath."  N.Y. C.P.L. § 60.20(2).

[9]  Respondent has not filed a response to Petitioner's objections and the time for doing so has passed.

28 U.S.C. § 636(b)(1)(C).  When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation to which the party objected.  *Id.*; *see also United States v. Romano*, No. 15-992-CR, 2022 WL 402394, at *3 (2d Cir. Feb. 10. 2022) (quoting *United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015)).  The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record.  *See S.J. v. N.Y.C. Dep't of Educ.*, No. 21-240-CV, 2022 WL 1409578, at *1 n.1 (2d Cir. May 4, 2022) (noting that district court applied correct legal standard in conducting *de novo* review of portions of magistrate's report to which specific objections were made and reviewing portions not objected to for clear error).  The clear error standard also applies when a party makes only conclusory or general objections. Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific written objections to the [magistrate judge's] proposed findings and recommendations."); *see also Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 579 (2d Cir. 2020) ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002))); *Benitez v. Parmer*, 654 F. App'x 502, 504 (2d Cir. 2016) (holding that "general objection[s] [are] insufficient to obtain *de novo* review by [a] district court").

Whether clear error review or *de novo* review applies when an objecting party reiterates the arguments made to the magistrate judge is unclear.  While the Second Circuit has suggested that clear error review is appropriate if a party's objection to a magistrate judge's report and recommendation repeats arguments already presented to and considered by the magistrate judge, *see Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments

19

does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b) . . . ."), the Second

Circuit has more recently stated that it is "skeptical" that the clear error standard would be

appropriate when the objection is based on a previously asserted argument, *see Moss v. Colvin*,

845 F.3d 516, 520 n.2 (2d Cir. 2017) ("[W]e are skeptical that clear error review would be

appropriate in this instance, where arguably 'the only way for [the plaintiff] to raise . . .

arguments [on that point] [was] to reiterate them.'" (third and fourth alterations in original) (first

quoting *Watson v. Geithner*, No. 11-CV-9527, 2013 WL 5441748, at *2 (S.D.N.Y. Sept. 27,

2013); and then citing 28 U.S.C. § 636(b)(1))).  *See also Joseph v. Korn*, No. 19-CV-7147, 2021

WL 912163, at *1 (E.D.N.Y. Mar. 9, 2021) ("Although '[o]bjections that reiterate arguments

considered and rejected by the magistrate are reviewed for clear error,' in an abundance of

caution, this [c]ourt reviews [the] [p]laintiff's arguments *de novo*." (citation omitted) (first

quoting *Cruz v. Colvin*, No. 13-CV-1267, 2014 WL 5089580, at *1 (S.D.N.Y. Sept. 25, 2014);

and then citing *Parker v. Comm'r of Soc. Sec'y Admin.*, No. 18-CV-3814, 2019 WL 4386050, at

*6 (Sept. 13, 2019))); *Harewood v. N.Y.C. Dep't of Educ.*, No. 18-CV-5487, 2021 WL 673476,

at *6 (S.D.N.Y. Feb. 22, 2021) ("[W]hen the objections simply reiterate previous arguments or

make only conclusory statements, the court should review such portions of the report only for

clear error." (first citing *Dickerson v. Conway*, No. 08-CV-8024, 2013 WL 3199094, at *1

(S.D.N.Y. June 25, 2013); and then citing *Kirk v. Burge*, 646 F. Supp. 2d 534, 538 (S.D.N.Y.

2009))), *aff'd*, No. 21-CV-584, 2022 WL 760739 (2d Cir. Mar. 14, 2022); *Castorina v. Saul*, No.

19-CV-991, 2020 WL 6781078, at *1 (S.D.N.Y. Nov. 18, 2020) ("While courts in this [d]istrict

sometimes state that objections that 'simply reiterate [the] original arguments' merit only clear

error review, this rule lacks support in either 28 U.S.C. § 636(b)(1)(C) or Rule 72(b)(2) of the

Federal Rules of Civil Procedure.  The Second Circuit has expressed similar skepticism."
(second alteration in original) (citation omitted)).

### ii.    Habeas petition

Under 28 U.S.C. § 2254, as amended by AEDPA, an application for a writ of habeas
corpus by a person in custody pursuant to a state court judgment may only be brought on the
grounds that his or her custody is "in violation of the Constitution or laws or treaties of the
United States."  28 U.S.C. § 2254(a).  A petitioner is required to show that the state court
decision, having been adjudicated on the merits, is either "contrary to, or involved an
unreasonable application of, clearly established Federal law" or "based on an unreasonable
determination of the facts in light of the evidence presented in the State court proceeding."  *Id.*
§ 2254(d)(1)–(2); *see also Edwards v. Vannoy*, 593 U.S. ---, ---, 141 S. Ct. 1547, 1564–65 (May
17, 2021) (Thomas, J., concurring); *Shoop v. Hill*, 586 U.S. ---, ---, 139 S. Ct. 504, 506 (Jan. 7,
2019) (per curiam) ("[H]abeas relief may be granted only if the state court's adjudication
'resulted in a decision that was contrary to, or involved an unreasonable application of,' Supreme
Court precedent that was 'clearly established' at the time of the adjudication." (quoting 28
U.S.C. §2254(d)(1))); *Sexton v. Beaudreaux*, 585 U.S. ---, ---, 138 S. Ct. 2555, 2558 (June 28,
2018) (per curiam); *Kernan v. Hinojosa*, 578 U.S. 412, 413 (2016) (per curiam); *Woods v.
Donald*, 575 U.S. 312, 313 (2015) (per curiam).  An adjudication on the merits is one that "(1)
disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment."  *Fischer v.
Smith*, 780 F.3d 556, 560 (2d Cir. 2015) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir.
2001)); *see also Harrington v. Richter*, 562 U.S. 86, 98 (2011).  Under the section 2254(d)
standards, a state court's decision must stand as long as "'fairminded jurists could disagree' on

the correctness of the state court's decision." *Woods v. Etherton*, 578 U.S. 113, 116–17 (2016) (per curiam) (quoting *Harrington*, 562 U.S. at 101).

For the purposes of federal habeas review, "clearly established law" is defined as "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)); *see also Kernan v. Cuero*, 583 U.S. ---, ---, 138 S. Ct. 4, 9 (Nov. 6, 2017) (per curiam) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" (quoting *Glebe v. Frost*, 574 U.S. 21, 24 (2014) (per curiam))); *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam) ("The Sixth Circuit also erred by consulting its own precedents, rather than those of this Court, in assessing the reasonableness of the [state] [c]ourt's decision."). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision (1) is contrary to Supreme Court precedent on a question of law, (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts, or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *See Williams*, 529 U.S. at 412–13. In order to establish that a state court decision is an unreasonable application of federal law, the state court decision must be "more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The decision must be "objectively unreasonable." *Id.*

A court may also grant habeas relief if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "[S]tate-court factual determinations [are not] unreasonable 'merely because [a federal post-conviction court] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015)

(quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).  Rather, factual determinations made by the

state court are "presumed to be correct," and the petitioner bears "the burden of rebutting the

presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Even if

"'[r]easonable minds reviewing the record might disagree about' the evidence, 'on habeas review

that does not suffice to'" overturn a state court factual determination.  *Tharpe v. Sellers*, 583 U.S.

---, ---, 138 S. Ct. 545, 553 (Jan. 8, 2018) (Thomas, J., dissenting) (alteration in original)

(quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)).  A court may overturn a state court's

factual determination only if the record cannot "plausibly be viewed" as consistent with the state

court's fact-finding or if "a reasonable factfinder must conclude" that the state court's decision

was inconsistent with the record evidence.  *Rice*, 546 U.S. at 340–41.

**b.   Unopposed portions of the R&R**

No party has objected to Judge Gold's recommendation that the Court reject Petitioner's

claims that the evidence at trial was insufficient to support his conviction as both procedurally

barred and without merit.  The Court has reviewed the unopposed portions of the R&R and,

finding no clear error, adopts these recommendations pursuant to 28 U.S.C. § 636(b)(1).[10]

---

[10]  Petitioner objects to Judge Gold's recitation of the fact that Cabrera saw Petitioner "banging on the victim[']s door between 2:00pm & 3:00pm" because "there is no evidence . . . that [he] was banging on the door at this time."  (Objs. 3.)  In addition, Petitioner objects to Judge Gold's statement that "the defense attempted to place . . . Livingston under suspicion by revealing that the [V]ictim had acquired a protective order against Livingston in 2002 and suggesting that Livingston was conspiring with . . . Najiyah[] to blame [P]etitioner for the [V]ictim's death, which Livingston may have in fact committed," (R&R 7), arguing that his trial lawyers' tactics "were not to use Mr. Livingston and his daughter as a scape-goat" but "to prove that the [Assistant District Attorney] lacked the physical evidence to prove that [Petitioner] was the one who committed murder."  (Objs. 4.)  Because the Court finds no clear error in Judge Gold's finding that Petitioner failed to exhaust his sufficiency and weight of the evidence claims, the Court does not separately address the merits of these claims.  However, the Court notes that even liberally construing these arguments as objections to Judge Gold's determination on the merits, they nevertheless fail.  As discussed below in connection with Petitioner's other claims,

###### c.   Claims based on failure to give a missing witness charge

Petitioner claims that the Trial Court's refusal to give a missing witness charge instructing the jury to draw an adverse inference from the prosecution's decision not to call Livingston violated his Sixth Amendment right to confront witnesses and Fourteenth Amendment right to a fair trial.  (Pet. 20–25.)  In his Petition, he argues that the Trial Court erroneously denied his request for a missing witness charge because Livingston was a material witness in the prosecution's control, as he was "the last person to have spoken on the telephone" with the Victim and also appeared on the prosecution's witness list.  (*Id.*)  Although Livingston testified to the Grand Jury that the Victim told him that Petitioner was "in the house with [her], do not bring the [kids] home yet," Petitioner argues that the prosecution did not call him as a witness and instead introduced his testimonial statements through Najiyah's testimony because it knew the defense would have elicited "the abusive past relationship [Livingston] had" with the Victim if Livingston took the stand, which would have harmed the prosecution's case.  (*Id.* at 20–23.)  Petitioner objects to Judge Gold's recitation of the fact that the prosecution argued a missing witness charge was inappropriate because Livingston's testimony would have been cumulative, as "any piece of circumstantial evidence that [Livingston] may have [had] was already testified to by [Najiyah] who . . . is a better witness," (Tr. 856:21–858:11), arguing that

---

the evidence was sufficient to support his conviction.  In addition, contrary to Petitioner's assertions, although surveillance footage of Petitioner banging on the Victim's door between 2:00 PM and 3:00 PM was not introduced at trial, Cabrera testified that she saw Petitioner banging on the Victim's door between 2:00 PM and 3:00 PM.  (Tr. 647:16–648:24.)  Further, Petitioner's trial counsel specifically stated that his intention in asking Najiyah questions "relating to her relationship with her father" and the "order of protection" was "to bring out that [Najiyah] favors her father over [Petitioner]" and "has been influenced by her father to testify the way she does," (Tr. 528:20–529:24), and that his intention in revealing that the Victim had acquired a protective order against Livingston in 2002 was to make the jury "aware that somebody other than [Petitioner] could have harmed [the Victim]," (Tr. 719:9–722:23).

New York Criminal Procedure Law section 60.20 prohibits the testimony of children Najiyah's age from being admitted, (Objs. 3).

The Court of Appeals found that "[e]ven if the Supreme Court erred in denying the defendant's request for a missing witness charge," any error was harmless, "as there was overwhelming evidence of [his] guilt and no significant probability that the error contributed to his conviction." *Johnson*, 943 N.Y.S.2d at 911 (quoting *Smalls*, 916 N.Y.S.2d at 795). Assuming without deciding that the failure to give a missing witness charge was an error that raises federal constitutional issues, any error was harmless.

On federal habeas review, a violation of a petitioner's federal rights during his or her state criminal proceedings is harmless — and therefore does not warrant habeas relief — unless the "error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Unlike on direct review,[11] a showing of harmlessness on collateral review requires "more than a 'reasonable possibility' that the error was harmful." *Davis v. Ayala*, 576 U.S. 257, 268 (2015) (quoting *Brecht*, 507 U.S. at 637). However, if a "conscientious judge [remains] in grave doubt about the likely effect of an error on the jury's verdict" — that is, "in the judge's mind, the matter is so evenly balanced that [the judge] feels . . . in virtual equipoise as to the harmlessness of the error" — then "the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (*i.e.*, as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)

---

[11] "On direct review, . . . the standard for determining whether a federal constitutional error is harmless . . . requires the government 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Spencer v. Capra*, 788 F. App'x 21, 22 (2d Cir. 2019) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

(quoting *Brecht*, 507 U.S. at 623). "[I]n § 2254 proceedings[,] a [federal] court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* . . . , whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard" generally applicable on direct review. *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

If the state courts do not conduct their own harmless error analysis, the preceding discussion represents the extent of the federal court's harmlessness analysis on federal habeas review because there is no state ruling which commands AEDPA deference. *See Orlando v. Nassau Cnty. Dist. Att'y's Off.*, 915 F.3d 113, 127 (2d Cir. 2019) (stating that because the Appellate Division did not find that the trial court erred in admitting the disputed testimony and therefore "did not determine that the admission of [the witness's] testimony as to [declarant's] statements was harmless, we owe no deference to the Appellate Division on that issue"); *Young v. Conway*, 698 F.3d 69, 87 (2d Cir. 2012) (providing no deference to a state court where there was no harmless error analysis).

Because the Appellate Division reasonably concluded that the failure to give a missing witness charge was harmless error, this Court cannot grant habeas relief on this claim.

### i.   This error is subject to a harmless error analysis

As an initial matter, the failure to give a missing witness charge is subject to harmless error analysis. Jury instruction errors generally do not fit within the small category of errors requiring automatic reversal. *See Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (per curiam) ("[H]armless-error analysis applies to [jury] instructional errors so long as the error at issue does not categorically 'vitiat[e] *all* the jury's findings.'" (third alteration in original) (quoting *Neder v.*

26

*United States*, 527 U.S. 1, 11 (1999))).  The failure to give a missing witness charge for

Livingston does not vitiate all of the jury's findings in the way that, for example, a failure to

properly define the reasonable doubt standard would.  *See Wilson v. Capra*, No. 15-CV-6495,

2020 WL 10506052, at *22 (E.D.N.Y. Oct. 12, 2020) (noting same); *see also Campbell v.

Fischer*, 103 F. App'x 683, 683 (2d Cir. 2004) (reviewing state court's refusal to give missing

witness charge for harmless error); *cf. Gaines v. Kelly*, 202 F.3d 598, 604 (2d Cir. 2000) (noting

that "a constitutional defect in a jury instruction defining reasonable doubt can never constitute

harmless error" because "the instructional error consists of a misdescription of the burden of

proof, which vitiates *all* the jury's findings" (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 281

(1993))).  Accordingly, the Trial Court's refusal to grant a missing witness instruction is

susceptible to harmless error analysis.

### ii.   The error was harmless

The error in this case is harmless.  "Instructional error is harmless only if it is 'clear

beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the

error.'"  *United States v. Demott*, 906 F.3d 231, 246 (2d Cir. 2018) (quoting *United States v.

Moran-Toala*, 726 F.3d 334, 344 (2d Cir. 2013)).  Courts analyzing the harmlessness of an

instructional error consider, among other things, the degree to which the trial court repeated the

instructional error before the jury as well as any counter-balancing instructions that would

mitigate the effect of the improper instruction or improperly withheld instruction.  *See Hill v.

Quigley*, 784 F. App'x 16, 19 (2d Cir. 2019); *Smalls v. Batista*, 191 F.3d 272, 282 (2d Cir. 1999).

The Trial Court did not give any instruction concerning the missing witness and therefore

the first factor — repetition of the error before the jury — weighs in favor of harmlessness.

The second factor — counter-balancing instructions — also weighs in favor of harmlessness. The Trial Court gave multiple instructions that mitigated against the absence of the missing witness instruction, including its charges that jurors must decide the case on the evidence alone without speculating concerning matters not presented. (Tr. 983:21–984:23, 989, 995:23–996:2.) This instruction specifically precluded jurors from speculating about what Livingston would have said had he testified. In addition, the Trial Court instructed the jurors that they could also consider the lack of evidence in evaluating Petitioner's guilt. (Tr. 995:23–997:5.)

The Trial Court also permitted defense counsel to comment in summation about Livingston's failure to testify, which comments mitigate the impact of a failure to give a missing witness charge. (Tr. 925:15–25); *see, e.g.*, *Bisnauth v. Morton*, No. 18-CV-4899, 2021 WL 3492746, at *15 (E.D.N.Y. Aug. 9, 2021) ("It is entirely speculative to suggest that the failure by the court to give a missing witness charge had any impact on the trial. Indeed, . . . defense counsel repeatedly argued to the jury the absence of McKenzie from the State's case-in-chief. Moreover, . . . there was overwhelming evidence of [the] petitioner's guilt." (citation omitted)); *Wilson*, 2020 WL 10506052, at *22 ("The [t]rial [c]ourt also permitted defense counsel to comment in summation about those witnesses' failure to testify, a ruling that mitigates the impact of a failure to issue a missing witness charge."); *Montanez v. Tynon*, No. 18-CV-1766, 2018 WL 6268221, at *14 (S.D.N.Y. Nov. 30, 2018) ("Furthermore, given that Montanez's trial counsel argued about the significance of Washington's absence at length in his summation, any prejudice from the denial of the charge was substantially abated." (citation omitted)); *Adamson v. Griffin*, No. 16-CV-511, 2016 WL 6780011, at *6 (S.D.N.Y. Nov. 16, 2016) ("Reversal is

particularly inappropriate where, as here, defense counsel urged an adverse inference in his summation.").

Moreover, the voluminous and weighty evidence against Petitioner further supports a harmlessness determination.  As Judge Gold found, the Appellate Division reasonably concluded that "there was overwhelming evidence of [petitioner's] guilt and no significant probability that the error contributed to his conviction."  (R&R 15, 26 (quoting *Johnson*, 943 N.Y.S.2d at 911).)  Najiyah testified that Petitioner forced his way into the apartment on numerous occasions, including the night of the murder, and pushed the Victim into an air conditioner, bruising her badly eight days prior to the murder.  (Tr. 497:6–7, 502:11–507:4, 514:3–9.)  Cabrera and Willis testified that the Victim told them Petitioner had beaten her, and Cabrera testified that she observed bruises on the Victim's face.  (Tr. 657:14–658:10, 677:7–678:8.)  Cabrera and Jordan testified that they had observed Petitioner banging on the Victim's door on several occasions and that the Victim would not let him in.  (Tr. 658:16–659:15, 764:1–24.)  Cabrera also testified that, on the day of the murder, she saw Petitioner banging on the Victim's door and cursing.  (Tr. 647:16–648:24.)  The Victim's downstairs neighbor heard a women yell "this man is killing me," (Tr. 620:22–621:10), and Shauna Tippins and Gloria Tippins testified that, moments before discovering the Victim's body, they encountered Petitioner and he told them he had done something "wrong" or "stupid" and pointed up in the direction of the apartment, a gesture captured by the surveillance video, (Tr. 544:24–545:7, 575:23–576:7).

In addition, Petitioner's own actions demonstrate his consciousness of guilt.  Following the murder, Petitioner fled to his mother's house in Pennsylvania in violation of his parole, was found hiding under a bed by police, and lied to the police by stating that he had not been in New York on the night of the murder.  (Tr. 701:19–25, 702:23–704:10, 739:10–741:3.)  Based on all

of the evidence in the case, any error in the refusal to give a missing witness charge was harmless. *See, e.g.*, *Gomez v. Griffin*, No. 17-CV-7249, 2021 WL 1224885, at *12 (E.D.N.Y. Mar. 31, 2021) ("[T]he trial court's refusal to give [a missing witness] instruction did not violate due process. Given the overwhelming evidence at trial against [the] [p]etitioner, the absence of a missing witness charge here could not have possibly prejudiced [the] [p]etitioner."); *Nicholas v. Miller*, No. 14-CV-5595, 2019 U.S. Dist. LEXIS 174538, at *28 (E.D.N.Y. Sept. 30, 2019) ("In light of the ample evidence of [the petitioner's] guilt, there is no reason to believe that an adverse inference charge would have affected the jury's verdict.").

### d. Hearsay claims

Petitioner claims that the Trial Court violated his Sixth Amendment right to confront witnesses and Fourteenth Amendment right to a fair trial by improperly admitting hearsay testimony from the Victim's friends about statements the Victim made describing Petitioner's prior bad acts, as this testimony was intended to show his propensity for violence and may have induced the jury to convict him "because of his past." (Pet. 26–31.) Petitioner requests that the Court treat his Memorandum of Law and Traverse "as an objection to [the R&R] regarding the hearsay testimon[y] from Ms. Cabrera and Ms. Willis."[12] (Objs. 6.)

### i. Sixth Amendment Confrontation Clause claim

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend VI. This constitutional provision, known as the Confrontation Clause, generally "prohibits the introduction of testimonial statements by a

---

[12] In view of the Second Circuit's statement that it is "skeptical" that the clear error standard would be appropriate when an objection is based on a previously asserted argument, *see Moss v. Colvin*, 845 F.3d 516, 520 n.2 (2d Cir. 2017), the Court reviews Petitioner's claims *de novo*.

nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had a prior opportunity for cross-examination.'" *Ohio v. Clark*, 576 U.S. 237, 243 (2015) (quoting *Crawford v. Washington*, 541 U.S. 36, 54 (2004)); *Whorton v. Bockting*, 549 U.S. 406, 413 (2007) ("[O]ur opinion in *Crawford* . . . held that '[t]estimonial statements of witnesses absent from trial' are admissible 'only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness].'" (quoting *Crawford*, 541 U.S. at 59)). Statements are "testimonial" when "in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Clark*, 576 U.S. at 245 (alteration in original) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). "[W]hen a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the [statement]' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the [statement] occurs." *Bryant*, 562 U.S. at 370.

An out-of-court statement does not acquire a testimonial character merely because the statement will be useful in a later criminal prosecution. *See Clark*, 576 U.S. at 245 ("[U]nder our precedents, a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial. 'Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence.'" (quoting *Bryant*, 562 U.S. at 359)); *Davis v. Washington*, 547 U.S. 813, 822 (2006) ("Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency."). For example, a domestic violence victim reporting an ongoing assault to a 911 dispatcher most likely makes her statements for the purpose of ensuring her personal safety, even if her statements could later be

31

useful to prosecute the abuser.  *See Davis*, 547 U.S. at 827–28.  Likewise, a gunshot-wound victim who — immediately before being transported by ambulance to a hospital for medical treatment — tells police about the circumstances of his shooting (including the identity of the shooter and the location of the shooting) most likely does so to assist police in apprehending a gunman on the loose, even if his statements could assist a subsequent prosecution of the assailant.  *See Bryant*, 562 U.S. at 371–78.  In addition, "statements to persons other than law enforcement officers . . . are much less likely to be testimonial than statements to law enforcement officers."  *Clark*, 576 U.S. at 246–49 (finding discussion between a three-year-old child and her preschool teachers about potential child abuse at the child's home most likely has the primary purpose of safeguarding the child from further abuse, even if those statements could support later criminal charges against the abuser).  As relevant here, the Supreme Court has noted, in a case arising in the domestic violence context, that "[s]tatements to friends and neighbors about abuse and intimidation" are not testimonial and "would be excluded, if at all, only by hearsay rules."  *Giles*, 554 U.S. at 376.

As Judge Gold correctly concluded, the Victim's out-of-court statements to her friends and neighbors about Petitioner's prior abuse were nontestimonial under *Giles*, and, as such, any testimony about these statements was "not admitted in violation of the Confrontation Clause, even if [it] may have been admitted in violation of New York's evidence rules."  (R&R 35 (citing *Giles*, 554 U.S. at 376).)  Indeed, even outside the domestic violence context discussed in *Giles*, courts have routinely distinguished between casual statements to acquaintances and "knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings," finding the former to be nontestimonial.  *United States v. Saget*, 377 F.3d 223, 228

(2d Cir. 2004); *see, e.g.*, *United States v. Gedinez*, 280 F. App'x 47, 49–50 (2d Cir. 2008) (finding statement of "non-testifying co-defendant made to an acquaintance" nontestimonial); *Saget*, 377 F.3d at 229 (finding statements nontestimonial where declarant "believed that he was having a casual conversation with a friend and potential co-conspirator"); *Burkett v. Artus*, No. 14-CV-110, 2016 WL 6659492, at *13 n.16 (N.D.N.Y. Nov. 10, 2016) (finding statements non-testimonial because "there [wa]s no indication that the declarant (i.e., the victim) had any reasonable expectation that her statements, made to friends and family outside the context of any proceeding, investigation, or formal complaint, would be used in future judicial proceedings"); *Augugliaro v. Bradt*, No. 08-CV-1548, 2014 WL 5093849, at *8 (E.D.N.Y. Oct. 6, 2014) (finding statements nontestimonial where made on declarant's "own initiative, in an off-hand and casual manner, and to a friend and co-conspirator"); *Ko v. Burge*, No. 06-CV-6826, 2008 WL 552629, at *10 (S.D.N.Y. Feb. 26, 2008) (finding statement "plainly nontestimonial" where it was "made to a friend over the phone with no intervention of any government authorities," "was "neither solicited by any law enforcement officers nor made in the context of any government investigation," and thus did "not bear any of the hallmarks of testimonial statements identified by the Supreme Court in *Crawford*").  Viewed objectively in light of all the circumstances, the primary purpose of the Victim's statements was likely to communicate an ongoing emergency to her friends and neighbors, rather than to "creat[e] an out-of-court substitute for trial testimony." *Clark*, 576 U.S. at 245 (alteration in original) (quoting *Bryant*, 562 U.S. at 358).  Accordingly, the Victim's statements were nontestimonial and Petitioner's Confrontation Clause claim fails.

### ii.   Fourteenth Amendment right to fair trial claim

"Merely showing that the state court admitted evidence in violation of state rules of evidence is not enough" to warrant federal post-conviction relief, "for such a state court decision

on state law, even if erroneous, is not an independent ground for the writ of habeas corpus to issue under AEDPA." *Griggs v. Lempke*, 797 F. App'x 612, 615 (2d Cir. 2020); *see also Estelle*, 502 U.S. at 67–68 (stating that inquiry into whether evidence was incorrectly admitted under state law "is no part of a federal court's habeas review of a state conviction" because "federal habeas corpus relief does not lie for errors of state law" (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990))).  However, a court may "review an error of state evidentiary law to assess whether the error deprived the petitioner of his due process right to a fundamentally fair trial." *Newkirk v. Capra*, 615 F. App'x 712, 713 n.2 (2d Cir. 2015) (quoting *Freeman v. Kadien*, 684 F.3d 30, 34–35 (2d Cir. 2012)); *see also Vincent v. Bennett*, 54 F. App'x 714, 717 (2d Cir. 2003).  A state law evidence violation becomes a federal constitutional violation if the evidence "is so extremely unfair that its admission violates fundamental conceptions of justice." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)); *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012); *see also Freeman*, 684 F.3d at 35; *McKinnon v. Superintendent*, 422 F. App'x 69, 73 (2d Cir. 2011) ("Such unfairness will only result where: '[t]he erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.  In short it must have been crucial, critical, [and] highly significant.'" (second alteration in original) (quoting *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985))); *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992).  Only a narrow set of evidentiary violations fits within this category.  *See Evans v. Fischer*, 712 F.3d 125, 133–34 (2d Cir. 2013).

Assuming without deciding that the Trial Court admitted Cabrera's and Willis's testimony about the Victim's statements to them in violation of state rules of evidence, this

testimony was not "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it," *McKinnon*, 422 F. App'x at 73 (quoting *Collins*, 755 F.2d at 19), and thus was not "so extremely unfair that its admission violate[d] 'fundamental conceptions of justice'" in violation of Petitioner's Fourteenth Amendment right to a fair trial, *Vega*, 669 F.3d at 126 (alteration in original) (quoting *Dowling*, 493 U.S. at 352). As Judge Gold noted, "the jury heard other evidence, besides the [V]ictim's statements," that suggested Petitioner and the Victim "had an abusive relationship," including Najiyah's testimony that Petitioner had pushed his way into the apartment on numerous occasions, pushing the Victim on one occasion and arguing with her on another, and Cabrera's testimony that she had seen bruises on the Victim's face and seen Petitioner banging on the Victim's door and yelling "open the f\*\*cking door." (*See* R&R 33–34.) Therefore, the Appellate Division's determination that any error was harmless was not unreasonable, and the Court denies Petitioner's claim that the Trial Court's erroneous admission of hearsay evidence of his prior bad acts violated his Fourteenth Amendment right to a fair trial.

> **e.   Ineffective assistance of counsel claim**

Petitioner asserts that the procedural default of his Confrontation Clause claim should be excused due to the ineffective assistance of trial and appellate counsel. (Objs. 5–6.) Although Petitioner does not object to Judge Gold's analysis of his ineffective assistance of trial counsel claim, the Court liberally construes Petitioner's objection to the procedural default of his Confrontation Clause claim as an objection to this analysis and as raising a new claim of ineffective assistance of appellate counsel.

### i.    Ineffective assistance of trial counsel

Petitioner argues that trial counsel provided ineffective assistance by "stumbling with words to the jury" and failing to object to the testimony of PO Chung and Willis, who had not seen the Victim in two years.  (Pet. 32.)  In addition, Petitioner argues that his attorney failed to preserve for appellate review the arguments that "the missing witness would have given . . . non-cumulative testimony," that "the evidence was legally insufficient to support the conviction for murder in the [second] degree," and that the Victim's statements, as recounted through the testimony of "two witnesses" — presumably Cabrera and Willis — "did not fit within a recognized exception to the hearsay rule."  (*Id.* at 33–34.)  Because the Appellate Division rejected Petitioner's ineffective assistance of counsel claim on the merits, the state court's finding is entitled to AEDPA deference.

"The Sixth Amendment right to counsel 'is the right to the effective assistance of counsel.'"  *Buck v. Davis*, 580 U.S. ---, ---, 137 S. Ct. 759, 775 (Feb. 22, 2017) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)); *see also Premo v. Moore*, 562 U.S. 115, 121–22 (2011).  "A defendant who claims to have been denied effective assistance must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice."  *Buck*, 580 U.S. at ---, 137 S. Ct. at 775 (citing *Strickland*, 466 U.S. at 687); *see also Sexton*, 585 U.S. at ---, 138 S. Ct. at 2558 ("To prove ineffective assistance of counsel, a petitioner must demonstrate both deficient performance and prejudice." (citing *Strickland*, 466 U.S. at 687)).  "Recognizing the 'tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence,' . . . counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"  *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (alteration in

original) (quoting *Strickland*, 466 U.S. at 690); *see also Bell v. Cone*, 535 U.S. 685, 698 (2002)

(stating that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that

"every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

perspective at the time" (alterations in original) (quoting *Strickland*, 466 U.S. at 689)); *United*

*States v. Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020) (same) (citing *Jackson v. Conway*, 763 F.3d

115, 153 (2d Cir. 2014)), *cert. denied*, 141 S. Ct. 1057 (Jan. 11, 2021).  While it is possible that,

in certain instances, even "an isolated error" can support an ineffective assistance claim, "it is

difficult to establish ineffective assistance when counsel's overall performance indicates active

and capable advocacy."  *Harrington*, 562 U.S. at 111.

The "highly deferential" *Strickland* standard is made "doubly so" on habeas review, as

AEDPA requires deference to the state court's ruling.  *Id.* at 105; *Premo*, 562 U.S. at 122; *see*

*Santone v. Fischer*, 689 F.3d 138, 154 (2d Cir. 2012); *see also Dunn v. Reeves*, 594 U.S. ---, ---,

141 S. Ct. 2405, 2410 (July 2, 2021) ("This analysis is 'doubly deferential' when, as here, a state

court has decided that counsel performed adequately." (quoting *Burt v. Titlow*, 571 U.S. 12, 15

(2013))).  Thus, on habeas review, the question is not whether counsel's actions were reasonable,

but "whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential

standard."  *Wilson v. Sellers*, 584 U.S. ---, ---, 138 S. Ct. 1188, 1199 n.1 (Apr. 17, 2018)

(Gorsuch, J., dissenting) (quoting *Premo*, 562 U.S. at 123).  "Surmounting *Strickland*'s high bar

is never an easy task."  *Lee v. United States*, 582 U.S. ---, ---, 137 S. Ct. 1958, 1967 (June 23,

2017) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

As Judge Gold found, "counsel's errors, if any, did not affect the outcome of

[P]etitioner's trial."  (R&R 36.)  Although Petitioner argues that his attorney failed to object to

the testimony of PO Chung and of Willis, (Pet. 32), Petitioner's trial counsel raised these issues at trial. (*See* Tr. 603:5–13, 919:22–920:1.)  Further, "defense counsel's attempt 'to minimize damaging testimony by offering to stipulate to testimony about [Petitioner's] parole' is just one example of what was an overall effective performance."[13]  (R&R 37 n.15 (quoting Resp't's Opp'n 36–38).)  In addition, counsel sought a missing witness charge, which was denied.  (Tr. 856:2–20, 858:12–20.)  Indeed, the Trial Court told defense counsel that he was "free to call Mr. Livingston if [he] want[ed] to get [Livingston's prior assault of the Victim] out," (Tr. 720:16–17, 722:3–4), and defense counsel made a tactical decision not to do so, stating "[w]hat am I going to do[,] ask him about his record and sit down?  I would be in a very bad position to do that and not ask him anything else," (Tr. 722:5–10).  Such decisions are afforded great deference in the face of an ineffective assistance of counsel claim.  *See Strickland*, 466 U.S. at 690 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.").

Finally, even assuming that counsel's performance was deficient because he stumbled over words or failed to raise the objections and arguments Petitioner highlights, Petitioner has not demonstrated that such performance prejudiced him.  *See id.* at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result

---

[13]  As Respondent outlines in its opposition to the petition, trial counsel also "made appropriate motions" that "were partially successful"; "vigorously opposed the prosecutor's [*People v. Molineux*, 168 N.Y. 264 (1901)] application"; requested certain material prior to trial "so he could thoroughly prepare" and "tried to discover other information throughout trial"; "thoroughly questioned the jurors" during *voir dire*; "gave a persuasive opening" and "proposed deficiencies in the prosecution's proof"; objected to the prosecution's questions and "successfully argued for the redaction of prosecution photographs" he believed were prejudicial; "thoroughly cross-examined the prosecution's witnesses" using their previous reports and prior testimony; and "elicit[ed] evidence favorable to the defense," including "that no one saw blood on [P]etitioner's clothes," even though blood would have "spew[ed]" from the Victim's injuries and she would have bled "profusely."  (Resp't's Opp'n 35–38 (footnote omitted).)

of the proceeding would have been different.").  As discussed above, there was ample evidence

of Petitioner's guilt before the jury.  *See Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010)

(stating that in determining prejudice, a habeas court "must consider the totality of the evidence

before the judge or jury" (quoting *Strickland*, 466 U.S. at 695)).  In view of all of the evidence in

the case, the Court is not persuaded that absent the alleged deficiencies in trial counsel's

performance, the verdict at trial would have been different.  *See Ainsley v. La Manna*, No. 18-

CV-3738, 2019 WL 1407325, at *13 (E.D.N.Y. Mar. 28, 2019) (holding that any deficient

performance by trial counsel did not satisfy *Strickland*'s prejudice prong because "substantial

evidence of [the] [p]etitioner's guilt was introduced at trial"); *Brown v. Lee*, No. 14-CV-9718,

2019 WL 5078360, at *10 n.8 (S.D.N.Y. Oct. 10, 2019) (finding no prejudice from alleged trial

counsel error in failing to object to admission of recorded telephone conversations between the

petitioner and the victim when "[t]he evidence against [the] [p]etitioner beyond the recording

included his own confession to the police, extensive testimony from the victim, and testimony

from another witness").

Accordingly, Petitioner is not entitled to habeas relief based on his ineffective assistance

of trial counsel claim.

### ii.   Ineffective assistance of appellate counsel

Petitioner asserts in his objections to the R&R that his failure to exhaust his

Confrontation Clause claim based on the lack of a missing witness charge should be excused

because the failure to raise this claim in his appellate brief was, at least in part, his appellate

counsel's decision.  (Objs. 4–6.)

To the extent Petitioner seeks to raise an ineffective assistance of appellate counsel claim,

Petitioner did not raise this claim in his Petition and may not do so for the first time in his

39

objections to the R&R. *Tashbook v. Petrucci*, No. 20-CV-5318, 2022 WL 884974, at *4 n.3 (S.D.N.Y. Mar. 25, 2022) ("To the extent [the pro se petitioner] attempts to bring [new] claims . . . , the [c]ourt declines to consider them, since they were not . . . raised in the [p]etition."); *Holguin v. Lee*, No. 13-CV-1492, 2016 WL 1030129, at *7 (S.D.N.Y. Mar. 10, 2016) (finding that the pro se petitioner was "not entitled to habeas relief based on these new claims because, in the context of federal habeas review, 'a petitioner is not permitted to raise an objection to a magistrate judge's report that was not raised in his original petition'" (quoting *Chisolm v. Headley*, 58 F. Supp. 2d 281, 284 n.2 (S.D.N.Y. 1999))); *Umoja v. Griffin*, No. 11-CV-736, 2014 U.S. Dist. LEXIS 73964, at *14–15 (E.D.N.Y. May 29, 2014) (rejecting pro se petitioner's objection to report and recommendation because it "has no impact on the [report and recommendation] before the [c]ourt," as it "is based on an entirely new claim, which is unexhausted," it is "doubtful that this new claim has any merit," and the petitioner did not provide "any explanation for his [new] claim"); *Ramirez v. United States*, No. 05-CV-2692, 2007 WL 2729019, at *3 (S.D.N.Y. Sept. 14, 2007) (noting that claim not raised in original habeas petition could not be raised for the first time in objections to a magistrate judge's report and that "[e]ven if [the] [p]etitioner raised this claim in his [p]etition, 'conclusory allegations' are 'insufficient to establish ineffective assistance of counsel'" (quoting *Jones v. Greene*, No. 05-CV-8997, 2007 WL 2089291, at *7 (S.D.N.Y. July 20, 2007))).

Accordingly, Petitioner is not entitled to habeas relief based on his ineffective assistance of appellate counsel claim.

### III.  Certificate of appealability

Having denied the petition for a writ of habeas corpus, the Court grants a certificate of appealability as to Petitioner's claims based on the Trial Court's refusal to give a missing witness

charge, claims based on the improper admission of hearsay, and ineffective assistance of counsel claims. The Court denies a certificate of appealability for Petitioner's sufficiency and weight of the evidence claims.

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a) Gov'g § 2254 Cases in the U.S. Dist. Cts. A court must issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This means that a habeas petitioner must demonstrate "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" *Hernandez v. Peery*, --- U.S. ---, ---, 141 S. Ct. 2231, 2234 (June 28, 2021) (Sotomayor, J., dissenting) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "This threshold question should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Buck*, 580 U.S. at ---, 137 S. Ct. at 773 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)). "Obtaining a certificate of appealability 'does not require a showing that the appeal will succeed,' and '[courts] should not decline the application . . . merely because [they] believe[] the applicant will not demonstrate an entitlement to relief.'" *Welch v. United States*, 578 U.S. 120, 127 (2016) (quoting *Miller-El*, 537 U.S. at 337). In fact, a certificate of appealability may issue even if "every jurist of reason might agree, after the [certificate of appealability] has been granted and the case has received full consideration, that petitioner will not prevail." *Buck*, 580 U.S. at ---, 137 S. Ct. at 774 (quoting *Miller-El*, 537 U.S. at 338).

The Court grants a certificate of appealability as to Petitioner's claims based on the Trial Court's refusal to give a missing witness charge, claims based on the improper admission of

hearsay, and ineffective assistance of trial counsel claim.  As to Petitioner's claims based on the

Trial Court's refusal to give a missing witness charge and claims based on the improper

admission of hearsay, although the Supreme Court has clearly mandated that "habeas corpus

relief does not lie for errors of state law," *see Estelle*, 502 U.S. at 67, reasonable jurors could

debate whether these errors rise to the level of constitutional magnitude to warrant federal habeas

relief.  While the Court expects that all reasonable jurists would eventually reach the same

conclusion as the Court, especially because these claims require double deference to the state

court's analysis of the harmlessness of these violations, in view of the fact that the claims are

"debatable," the Court must issue a certificate of appealability.  *See Buck*, 580 U.S. at ---, 137 S.

Ct. at 774; *Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) ("The standard for issuing the

certificate of appealability is whether 'jurists of reason would find it debatable whether the

petition states a valid claim.'" (quoting *Slack*, 529 U.S. at 478)); *Waiters v. Lee*, No. 13-CV-3636,

2020 WL 3432638, at \*14 (E.D.N.Y. June 23, 2020), *aff'd*, No. 20-2190, 2021 WL 5183539 (2d

Cir. Nov. 9, 2021).

The Court also grants a certificate of appealability for Petitioner's ineffective assistance

of counsel claims, and, relatedly, for the procedural default of Petitioner's Confrontation Clause

claim based on the Trial Court's refusal to give a missing witness charge, which Petitioner

argues was caused by ineffective assistance of counsel.  Adjudicating a claim of ineffective

assistance necessarily requires complex judgments about the reasonableness of counsel's actions

in light of all the facts.  These claims are not amenable to hard-and-fast conclusions but instead

require a searching inquiry into the circumstances.  Given the fungible and imprecise

"reasonableness" standard of *Strickland*'s first prong, and that a determination of whether

counsel's alleged errors prejudiced Petitioner requires a consideration of all the evidence, the

42

Court believes that reasonable jurists could at least debate Petitioner's ineffective assistance of counsel claims.  In view of the high bar for success on *Strickland* claims, compounded by the high bar for a federal habeas court to overturn a state court's adjudication of a *Strickland* claim on its merits, the Court expects that all reasonable jurists would eventually reach the same conclusion as the Court on these claims as well, but because they are "debatable," the Court must issue a certificate of appealability.  *See Buck*, 580 U.S. at ---, 137 S. Ct. at 774; *Waiters*, 2020 WL 3432638, at *14.

Finally, the Court denies a certificate of appealability for Petitioner's sufficiency and weight of the evidence claims.  No reasonable jurist would debate whether a procedural bar applies to these claims.  In addition, reasonable jurists would not debate these claims because Petitioner raised them for the first time in his reply brief.  The principle that courts will not consider arguments first raised in a reply brief is a well-settled prudential doctrine familiar to litigators and judges throughout the nation.  *Evangelista v. Ashcroft*, 359 F.3d 145, 155 n.4 (2d Cir. 2004).  The Second Circuit has followed that practice for nearly a century and continues to do so today.  *See Diaz v. United States*, 633 F. App'x 551, 556 (2d Cir. 2015); *Dixon v. Miller*, 293 F.3d 74, 80 (2d Cir. 2002); *Smith v. U.S. Shipping Bd. Emergency Fleet Corp.*, 26 F.2d 337, 339 (2d Cir. 1928).

## IV.   Conclusion

The Court has reviewed the R&R and, finding no error, clear or otherwise, adopts the R&R pursuant to 28 U.S.C. § 636(b)(1).  Accordingly, the Court denies the petition for a writ of habeas corpus.  The Court issues a certificate of appealability as to Petitioner's claims based on the Trial Court's refusal to give a missing witness charge, claims based on the improper admission of hearsay, and ineffective assistance of trial counsel claim.  The Court denies a

43

certificate of appealability as to Petitioner's sufficiency and weight of the evidence claims.  The

Clerk of Court is directed to enter judgment and close this case.

Dated: August 12, 2022
       Brooklyn, New York

                                         SO ORDERED:


                                         s/ MKB

                                         _____
                                         MARGO K. BRODIE
                                         United States District Judge

44